2008 UT 51

**Welden L. DAINES, Plaintiff and Appellant,**

v.

**Richard B. VINCENT and ASC Group, L.C., a Utah limited liability company, Defendants and Appellees.**

**No. 20060838.**

Supreme Court of Utah.

July 29, 2008.

Nick J. Colessides, John Martinez, Salt Lake City, for plaintiff.

Francis M. Wikstrom, Michael P. Petrogeorge, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case comes to us on appeal from directed verdicts granted by the trial court. Welden Daines sued the Ambulatory Surgical Centers Group, L.C. (ASC) and Richard Vincent seeking to enforce an alleged oral agreement. After Daines presented his case-in-chief, the trial court granted directed verdicts against him effectively dismissing all of his claims. Central to the appeal before us is an agreement (Release) signed by Daines releasing West Valley Surgical Center (WVSC) or "any of its members," of which ASC is one, from "any and all claims in connection with services provided ... for the organization, development, and operation of an ambulatory surgical center." We are asked to determine whether this language is facially ambiguous and can reasonably support contrary interpretations. We conclude that it is not and affirm the trial court's holding that the language of the Release is not ambiguous as a matter of law.

¶ 2 Daines also challenges the trial court's directed verdict on his claim of fraud and his claim against Mr. Vincent personally. We affirm each of these directed verdicts. Daines also appeals the trial court's denial of his motion to admit a trial order from the case of *Lipscomb v. Vincent* (Lipscomb order) as part of his case-in-chief and to challenge Vincent's veracity as a witness. Findings of Fact, Conclusions of Law and Order, *Lipscomb v. Vincent*, No. 970600134–CV (Utah 3d Dist. Feb. 2, 2001).[1] We affirm the trial court's decision to exclude the Lipscomb order as impermissible character evidence.

¶ 3 Finally, Daines argues that the trial court's directed verdicts denied him his day in court. We disagree. We also find that the trial court's award of costs to ASC and Vincent was appropriate and consistent with rule 54 of the Utah Rules of Civil Procedure.

## BACKGROUND

¶ 4 Welden Daines is a retired CPA. During his career and into his retirement, he worked for several physicians as an accountant and medical center manager. In early 2000, one of his clients, Dr. Burrows, indicated that he and several other surgeons were interested in starting a surgical center. A surgical center is generally an outpatient surgical group co-owned by the surgeons involved. Surgical centers provide surgeons

---

1. The Lipscomb order was entered in a different case in which Vincent was a defendant.

with greater control over their working environment and an opportunity to enjoy higher profits from their work than typically experienced in a traditional relationship with a hospital.

¶ 5 ASC, now known as Nueterra Healthcare, is in the business of organizing, developing, and managing surgical centers. Vincent is the co-founder of ASC and was either a member or chairman of the board of ASC during the relevant period.

## I. THE MEMORANDUM OF UNDERSTANDING

¶ 6 On September 22, 2000, Daines met with Vincent to discuss the possibility of organizing a new surgical center in West Valley City. Daines met Vincent through Bob Smith, a health care consultant who had worked with ASC. Daines prepared a Memorandum of Understanding (MOU) which he presented to Smith and Vincent. The MOU prepared by Daines indicated that Daines would give ASC a list of physicians from West Valley City in exchange for $150,000 plus expenses. Vincent and Smith signed the MOU on signature lines provided for them by Daines under the heading "ASC."

¶ 7 On September 27, 2000, Daines faxed a list of physicians to Vincent and Smith. That night, Daines arranged a meeting with Vincent, Smith, and several of the physicians on the list, including Dr. McCray and Dr. Burrows, whom Daines referred to as "the leaders." During the meeting, Vincent presented the physicians with an informational brochure detailing ASC's process of organizing, developing, and managing surgical centers. Based on the success of this first meeting,

ASC began preparing feasibility studies and term sheets.[2] ASC presented the first set of term sheets to the doctors on November 21, 2000, proposing the formation of WVSC. Section 13 of the first set of term sheets, titled "Development Fees," included a provision for WVSC to pay Daines $150,000 "for the introduction of ASC to this project." Section 13 indicated that the fee would be paid for by WVSC.

¶ 8 On November 22, 2000, a second set of term sheets was prepared with a change in the Development Fees provision for Daines. According to the November 22 term sheets, "Quantum Ventures, L.L.C., of which Mr. Welden Daines is a principal" was to receive a fee either "in the form of cash or equity in [WVSC]." No separate fee was provided for Daines individually. Like the fee provision for Daines in the November 21 term sheets, WVSC was liable for the "cash or equity" provision for Quantum Ventures in the November 22 term sheets.

## II. THE FIRST ORAL AGREEMENT

¶ 9 Thereafter, Daines began actively negotiating with ASC on behalf of the surgeons. At some point after beginning negotiations with ASC, Daines told Dr. Burrows that he was "uncomfortable" because he felt that both ASC and the surgeons expected him to negotiate on their behalf. On December 13, 2000, while still negotiating with ASC on behalf of the surgeons, Daines met with Vincent. During this meeting, Daines claims that he entered into an oral agreement with Vincent to forego his $150,000 compensation under the MOU in exchange for 8 Class II shares of ownership in WVSC.[3]

---

2. A term sheet is "[a] document setting forth all information that is material to investors about the offering but is not disclosed in the accompanying prospectus or confirmation." *Black's Law Dictionary*, 1512 (8th ed.2004). A term sheet is also referred to as a "letter of intent." *Id.* In this case, the term sheets, which went through several revisions before being agreed to, represent the "items discussed between the participants" engaged in the establishment of WVSC. The term sheets in the present case include, inter alia, a "feasibility study for the creation of the surgical center," "ownership rights and privileges," and "the persons and entities who would be able to participate in the venture."

3. The term sheets indicate that the initial offering of 100 shares of ownership in WVSC would break down as follows: 20 Class II shares were reserved for ASC only, while 80 Class I shares would be made available to participating surgeons. Class II shares were to be sold initially for $8,500. This means that ASC would have had to pay only $68,000 to compensate Daines under the oral agreement, provided that such an arrangement were even possible under the proposed term sheets. Even though the initial value of the shares referenced in the oral agreement was worth a little more than a third of the value of the MOU, their current value is nearly $4 million. The oral agreement would have also

¶ 10 The term sheets following the December 13 meeting and oral agreement between Daines and Vincent did not include a provision for payment to Daines or Quantum Ventures. On January 4, 2001, Vincent made a note during a phone call with Daines that "Welden has torn up his prior agreement and is only working for them." During subsequent negotiations of the term sheets, Daines sent an email to Vincent stating "nothing for me."

### III. REAL ESTATE DEVELOPMENT AND A SECOND ORAL AGREEMENT

¶ 11 In February 2001, the surgeons and ASC reached an agreement and formed WVSC. After the formation of WVSC, Daines and Smith began working together to develop several real estate properties for the new center. Daines testified that the surgeons asked him to be involved in the real estate development process. However, there is no indication that the surgeons, WVSC, or ASC made any contractual agreements with Daines for his services as a real estate developer. One of the sites Daines and Smith worked on was a site located in West Valley, and controlled by The Boyer Company (Boyer). Boyer had exclusive rights to develop that site (Boyer site). At some point during the development process, and at the request of Dr. Burrows, Boyer entered into an oral agreement with Daines promising him payment in connection with his work on the Boyer site if the site was selected. In September, 2001, the WVSC board selected the Boyer site as the location of the new surgical center. Following the site selection, Daines phoned Vincent on September 25, 2001 to inquire about the eight shares promised in the first oral agreement. Daines testified that Vincent responded by asking, "What eight shares?"

### IV. THE RELEASE

¶ 12 On October 8, 2001, Daines sent a letter to Lynn Summerhays of Boyer requesting payment of $50,000, based on their oral agreement, for work done in connection with the development of the Boyer site. Summerhays responded with a letter substantiating the oral agreement, but indicated that the offer "came as a result of a request from Dr. Burrows" and that payment would follow the "rental commencement of the center." Daines responded by sending a fax to Dr. Burrows on October 29, asking for help in obtaining payment from Boyer. On October 30, 2001, Dr. Burrows proposed to the WVSC board that Daines be paid immediately since his work was "pretty well complete." The board determined that ASC would pay Daines $6,000 for his out-of-pocket expenses. Boyer would subsequently reimburse ASC for the $6,000 and pay the balance of the $50,000 to Daines when the lease was executed.

¶ 13 Two days after the board meeting, Daines faxed an invoice to "ASC West Valley Surgical Center" for $6,000, indicating that the balance of his fee for work performed for WVSC would be paid by Boyer once the surgical center was open. On December 10, Dr. McCray sent a letter to Daines with the Release, stating that a check had been made out to Daines for $6,000 and would be released when Daines signed and returned the Release.

¶ 14 The Release states:

We, Welden L. Daines and Robert Smith, do hereby conditionally release West Valley Surgical Center, LLC or any of its members from any and all liabilities and or claims in connection with services provided by us for the due diligence, acquisition of real estate, or any other services rendered to date for West Valley Surgical Center, or on behalf of its members, for the organization, development and operation of an ambulatory surgical center in the West Valley and any services connected with the same. This release encompasses and satisfies any prior agreements and discussions whether written or verbal by the West Valley Surgical Center, LLC or any of its members.

This release shall be conditioned upon the receipt of $50,000 due and payable from the real estate developer of the West

given Daines a larger interest than any of the participating surgeons individually and would

have cut ASC's ownership interest from twenty shares down to twelve.

Valley City Surgical Center. In addition, by signing below, we agree that any partial amounts paid against the $50,000 liability either by West Valley Surgical Center, LLC or by The Boyer Company, Developer of the Real Estate for the project for amounts owed us shall become unconditionally released by us upon confirmed receipt of said partial payments.

Daines and Smith signed and returned the Release on December 11, 2001. After receiving the Release, WVSC forwarded a $6,000 check to Daines.

¶ 15 On March 20, 2003, Boyer made out a check to "Daines Associates" for $50,000. Daines accepted the check and used a portion of it to pay Smith for his efforts. On April 23, 2003, Daines faxed Vincent another request for the eight shares discussed in the first oral agreement. Vincent denied Daines' request.

## PROCEDURAL HISTORY

¶ 16 On May 8, 2003, Daines filed claims against ASC and Vincent for breach of contract, promissory estoppel, fraudulent inducement to contract, breach of implied covenant of good faith and fair dealing, negligent misrepresentation, unjust enrichment-quantum meruit, and specific performance.

¶ 17 Before trial, Daines made a motion to admit the Lipscomb order as part of his case-in-chief and to challenge Vincent's veracity. The Lipscomb order included comments on Vincent's character, including a reference to Vincent's "convenient lapses of memory" and his lack of reliability as a witness. The trial court rejected Daines' motion.

¶ 18 Following the presentation of Daines' case-in-chief, the trial court granted motions by ASC and Vincent for directed verdicts and dismissed all claims with prejudice. The first directed verdict dismissed all of Daines' fraud claims. The trial court found that Daines failed to satisfy most of the required elements to sustain a fraud claim. The second directed verdict dismissed Daines' claims against Vincent individually. The court held,

based on the evidence presented, that "no reasonable jury could conclude that Vincent acted in any other way than as a representative of ASC." In the third directed verdict, the court held that the Release signed by Daines was "clear and unambiguous as a matter of law." As part of its analysis, the trial court assumed the existence of the alleged December 13, 2000 oral agreement between Vincent (acting on behalf of ASC) and Daines for eight shares in WVSC.[4] Assuming the existence of the oral agreement, the court held that by signing the Release, which "supersede[d] any and all other contracts, whether written or oral," Daines "gave up any right he may have had to pursue the claims asserted against ASC," including his right to claim eight shares in WVSC under the alleged oral agreement. Thus, the court found that it was not necessary to reach a determination as to the existence of the oral agreement since it would be covered under the unambiguous terms of the Release if it did exist, and therefore would not be binding.

¶ 19 Daines challenges the directed verdicts and the trial court's denial of his motion seeking admittance of the Lipscomb order. Daines also raises questions regarding an award of costs and sanctions based on the ripeness of the filing of this appeal. The trial court granted ASC and Vincent's directed verdict motions on August 22, 2006. ASC and Vincent served Daines a copy of a Memorandum of Costs on September 11, 2006. On October 11, 2006, the trial court entered final judgment and awarded costs in favor of ASC and Vincent. Before the trial court entered final judgment and awarded costs to ASC and Vincent, Daines filed this appeal on September 8th, 2006. After filing the appeal, Daines filed an objection with this court asserting that the trial court no longer had jurisdiction to make an award. In response, ASC and Vincent filed a motion with this court to dismiss for lack of jurisdiction as the trial court had not yet rendered a final judgment. Daines replied with a claim that the motion filed by ASC and Vincent was frivolous and requested sanctions. We deferred ruling on the motions until after we ruled on

---

**4.** Although assuming the existence of an oral agreement, the trial court noted that it had "serious doubts" that a jury would in fact conclude

that an oral contract had been formed and would be able to do so only by ignoring several pieces of evidence presented at trial.

the merits. We have jurisdiction over this case pursuant to Utah Code Section 78A–3–102(3)(j) (2008).

## STANDARD OF REVIEW

¶ 20 We will sustain a directed verdict if after "examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467.

¶ 21 With regard to our review of the exclusion of evidence, we grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion. *State v. Whittle*, 1999 UT 96, ¶ 20, 989 P.2d 52. Thus, we will not reverse a trial court's ruling on evidence unless the ruling "was beyond the limits of reasonability." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 57, 82 P.3d 1076 (quoting *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992)).

## ANALYSIS

### I. DETERMINATION OF INTEGRATION

¶ 22 Viewing the evidence in a light most favorable to Daines, we agree with the trial court's finding that the Release is an integrated agreement. Consistent with our line of contract analysis cases, we first determine whether or not the Release constitutes an integrated agreement before considering whether the evidence offered by Daines supports a finding of facial ambiguity. *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026, 1027 (Utah 1995), *overruled on other grounds by Tangren Family Trust v. Tangren*, 2008 UT 20, 182 P.3d 326. We have held that an integrated agreement is "a writing or writings constituting a final expression of one or more terms of an agreement." *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (quoting *Hall*, 890 P.2d at 1027). Additionally, we recently held in *Tangren* that "[e]xtrinsic evidence ... is not admissible on the question of integration where the contract at issue con-

tains a clear integration clause." 2008 UT 20, ¶ 19, 182 P.3d 326. Thus, a contract is integrated if it contains a "clear integration clause." *Id.*

¶ 23 Daines argues that the Release is not integrated because it does not contain a "real integration clause" stating that the document covers the entire agreement between the parties. We disagree. The Release states: "This release encompasses and satisfies any prior agreements and discussions whether written or verbal by West Valley Surgical Center, LLC or any of its members." The language indicating that the Release "satisfies any prior agreements and discussions whether written or oral" satisfies the "clear integration clause" standard articulated in *Tangren.* Therefore, we affirm the trial court's conclusion that the Release constitutes an integrated agreement.

### II. DETERMINATION OF AMBIGUITY

¶ 24 Having found that the Release is integrated, we now turn to an analysis of ambiguity. This case gives us the opportunity to discuss the standard for determining contractual ambiguity. In *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264 (Utah 1995), we established a standard for determining ambiguity in two separate contexts: facial ambiguity and ambiguity with regard to intent. To the extent that our ruling in *Ward* has created confusion as to the proper relationship between relevant, extrinsic evidence reviewed by the judge in making a determination of facial ambiguity and the plain language within the "four corners" of the contract, we take this opportunity to clarify. After clarifying the *Ward* rule, we will apply the rule to the facts in the present case.

#### A. The Ward Rule

¶ 25 A contractual term or provision is ambiguous "if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 20, 54 P.3d 1139 (quoting *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669). In *Ward*, we indicated that contractual ambigui-

ty can occur in two different contexts: (1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties. 907 P.2d at 268. The first context presents a question of law to be determined by the judge. *WebBank*, 2002 UT 88, ¶ 22, 54 P.3d 1139. The second context presents a question of fact where, if the judge determines that the contract is facially ambiguous, "parol evidence of the parties' intentions should be admitted." *Winegar v. Froerer*, 813 P.2d 104, 108 (Utah 1991); *see also SME Indus., Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669. Thus, before permitting recourse to parol evidence, a court must make a determination of facial ambiguity. *Ward*, 907 P.2d at 268; *Winegar*, 813 P.2d at 108. Because the question of ambiguity begins with an analysis of facial ambiguity, we address *Ward's* articulation of the test for determining facial ambiguity.

¶ 26 In *Ward* we set forth a two-part standard for determining facial ambiguity. First, we indicated that "[w]hen determining whether a contract is ambiguous, any relevant evidence must be considered. Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the 'extrinsic evidence of the judge's own linguistic education and experience.'" *Ward*, 907 P.2d at 268 (internal quotation marks omitted) (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 643 (1968)). Second, after a judge considers relevant and credible evidence of contrary interpretations, the judge must ensure that "the interpretations contended for are reasonably supported by the language of the contract." *Ward*, 907 P.2d at 268.

¶ 27 In articulating the *Ward* rule, we sought to establish a balanced, "better-reasoned" approach to an analysis of facial ambiguity that would allow judges to "consider the writing in the light of the surrounding circumstances." *Id.* However, we did not intend that a judge allow surrounding circumstances to create ambiguity where the language of a contract would not otherwise permit. In other words, our statement that "[r]ational interpretation requires at least a preliminary consideration of all credible evi-

dence," *id.* (internal quotation marks omitted), does not create a preference for that evidence over the language of the contract. *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428 (stating that alternative interpretations of contractual language must be supported by the usual and natural meaning of the language used). Thus, under *Ward*, a finding of ambiguity after a review of relevant, extrinsic evidence is appropriate only when "reasonably supported by the language of the contract." *Ward*, 907 P.2d at 268.

¶ 28 Our holding in *Ward* demonstrates the proper application of the rule. In that case, we found ambiguity in the phrase "of safflower." *Id.* at 269. Ward contracted with Intermountain Farmers Association (IFA) to spray his safflower field with fertilizer and herbicide. *Id.* at 265. The sprayer used on Ward's field had previously been used to spray Velpar L, an herbicide strong enough to kill safflower. *Id.* The sprayer was not properly cleaned before it was used to spray Ward's field. *Id.* After his field was sprayed, a significant amount of Ward's safflower crop died. *Id.* In negotiating a settlement, IFA presented Ward with a release stating that upon receipt of payment for damages, Ward would "release and hold harmless Intermountain Farmers Association for any and all damages caused by the spraying of [Ward's] nineteen acres of safflower." *Id.* at 265–66. In his affidavit, Ward testified that he initially refused to sign the release because he was concerned about the lingering effects of the Velpar L on the field in which the safflower was planted and not just for the damage done to his safflower crop. *Id.* at 266. In his affidavit, Ward indicated that IFA told him "not to worry" and that he should "go ahead and plant beans in the field." *Id.* The next year, Ward's bean crop, planted in the same field, began to die. *Id.* IFA did not compensate Ward for the damages to his bean crop and Ward filed suit for breach of contract. *Id.* We concluded that the language of the agreement, specifically the phrase "of safflower," was susceptible to two interpretations: "Although the phrase 'of safflower' could be read to simply define the field, it could also be construed to specify the damage subject to release." *Id.* at 269. In

finding ambiguity in *Ward,* we considered the extrinsic evidence offered by Ward in order to view the "writing in light of the surrounding circumstances." *Id.* at 268. However, our analysis of the evidence offered by Ward was ultimately circumscribed by the language of the agreement—specifically by the phrase "of safflower." *Id.* at 269.

¶ 29 In addition to finding ambiguity in the express terms of a release, we have also found ambiguity in a contract taken as a whole, *WebBank,* 2002 UT 88, ¶¶ 27–29, 54 P.3d 1139 (remanding for the admission of parol evidence because we found "it [was] unclear from the language and provisions contained in the security agreement and promissory note whether [the parties] intended to effectuate a genuine secured transaction or whether they intended to create a sale or an assignment"); where there are missing terms in a contract, *Nielsen v. Gold's Gym,* 2003 UT 37, ¶ 14, 78 P.3d 600 (finding ambiguity because a contract was silent as to responsibility for key improvements significant to the agreement); and in the parties' course of conduct, *Peterson v. Sunrider Corp.,* 2002 UT 43, ¶¶ 22–23, 48 P.3d 918 (finding ambiguity in contractual terms because of a history of bonus payments even when express obligations articulated in the agreement had not been met). In *WebBank, Nielsen,* and *Sunrider Corp.,* contrary interpretations of the agreement were checked against the plain language of the contract. Thus, each time we found ambiguity, we found that the contrary interpretations were "reasonably supported by the language of the contract." *Ward,* 907 P.2d at 268.

¶ 30 Likewise, in cases where we have not found ambiguity, the language of the contract or release was not susceptible to "contrary, tenable interpretations." *WebBank,* 2002 UT 88, ¶ 27, 54 P.3d 1139 (quoting *SME Indus., Inc.,* 2001 UT 54, ¶ 15, 28 P.3d 669); *see also Saleh,* 2006 UT 20, ¶ 18, 133 P.3d 428 (finding no ambiguity because plaintiff's interpretation would effectively change a key term of the release); *Peterson v. Coca-Cola USA,* 2002 UT 42, ¶ 12, 48 P.3d 941 (finding "that the release [was] unambiguous because it [was] not 'capable of more than one reasonable interpretation'" (quoting *Winegar,* 813 P.2d at 108)). Since our articulation of the *Ward* rule, our consideration of extrinsic evidence offered to demonstrate ambiguity has been circumscribed by the requirement that the interpretations argued for must be "reasonably supported by the language of the contract." *Ward,* 907 P.2d at 268. Thus, a correct application of the *Ward* rule to determine what the writing means begins and ends with the language of the contract.[5]

¶ 31 As illustrated by our line of facial ambiguity cases, the two-part *Ward* rule requires that a judge first review relevant and credible extrinsic evidence offered to demonstrate that there is in fact an ambiguity. After reviewing the evidence offered, the *Ward* rule justifies a finding of ambiguity only if the competing interpretations are "reasonably supported by the language of the contract." *Ward,* 907 P.2d at 268. Conversely, there can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms. *See Saleh,* 2006 UT 20, ¶ 17, 133 P.3d 428 (stating that contractual language cannot be ambiguous because parties seek to "endow [it] with

---

5. While the *Ward* rule allows for the admission of extrinsic evidence to uncover ambiguity, a finding of ambiguity will prove to be the exception and not the rule. Our holding in *Ward* provides for instances, though rare, where contractual terms are subject to alternative interpretations based on usage. For instance, to an American, the term "boot" refers to something you wear on your foot, but a person from Britain or New Zealand might refer to a "boot" as the storage area in the back of a car—what Americans would refer to as a "trunk." Likewise, in America, we get "braces" to straighten our teeth, whereas the British use them to hold up their pants. When contracting parties have a contrasting under-

standing of express terms due to usage, the *Ward* rule provides the court with the ability to "place itself in the same situation in which the parties found themselves at the time of contracting." *Ward,* 907 P.2d at 268 (internal quotation marks omitted). However, as stated above, any contended for interpretation must be "reasonably supported by the language of the contract." *Id.* More simply put, a party cannot make a successful claim of ambiguity based on usage of a term that is not reasonable or is the product of "forced or strained construction." *Saleh,* 2006 UT 20, ¶ 17, 133 P.3d 428 (internal quotation marks omitted).

a different interpretation according to [their] own interests" (citing *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274–75 (Utah 1993)) ). Thus, even though we permit admission of extrinsic evidence to support a claim of ambiguity in contractual language, the claim "must be plausible and reasonable in light of the language used." *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998).

¶ 32 We now apply the two parts of the *Ward* rule to the Release in the present case.

### B. The Release Signed by Daines is Not Ambiguous as a Matter of Law

■ ¶ 33 Applying the *Ward* rule and examining the evidence in a light most favorable to Daines, we affirm the trial court's directed verdict and find that the Release is unambiguous as a matter of law.

¶ 34 The plain language of the Release states that Daines will release "West Valley Surgical Center, LLC or any of its members from any and all liabilities and or claims in connection with services provided . . . for the organization, development and operation of an ambulatory surgical center in the West Valley and any services connected with the same" in exchange for $50,000 to be paid by the real estate developer. Consistent with the first part of the *Ward* rule, we review extrinsic evidence offered by Daines in support of his claim of ambiguity. Daines offers evidence in the form of a series of documents and instruments written or executed in the days before he signed the Release. These include an invoice for $6,000 with a balance of $44,000 to be paid by Boyer, e-mails and letters regarding the second oral agreement, and the check for $6,000. Daines argues that this evidence indicates that when he signed the Release, he was considering only the

amount due under the oral agreement with Boyer. Daines argues that the Release therefore did not cover any other obligations owed to him by WVSC or its members. Specifically, Daines argues that the Release does not cover the oral agreement for eight shares in WVSC. Applying the second part of the *Ward* rule, we find that the language of the Release is not reasonably susceptible to Daines' interpretation. Under the terms of the Release, Daines agreed to release WVSC and "any of its members" from "any and all liabilities or claims in connection with services provided . . . for the organization, development and operation of an ambulatory surgical center in the West Valley." The language of the Release establishes two hurdles which the evidence offered by Daines fails to clear.

¶ 35 First, the evidence offered by Daines fails to indicate how ASC is not a "member" of WVSC. Conversely, Daines stipulated that at the time he signed the Release, he knew that ASC was a member of WVSC. Additionally, the term sheets, with which Daines admits he was very familiar from the beginning of the process, make it clear that ASC operated from the understanding that it would be a member of WVSC as soon as it was formed. ASC's membership in WVSC was, at all times during the negotiations, a foregone conclusion. In other words, there was never a time in the entire process where ASC either was not a member of WVSC or was not operating under the assumption that it would become a member of WVSC as soon as it was formed.[6] To hold that ASC was not a member for the purposes of the Release would be to impose a meaning "not reasonably supported by the language" of the Release.[7] *Ward*, 907 P.2d at 268.

---

**6.** To the contrary, the evidence submitted by Daines supports the conclusion that the purpose of ASC's involvement in the transaction was to become a member of an LLC that would open a surgical center in West Valley. Once the surgical center was open, it is also clear that ASC would become the managing entity of the center. ASC's level of involvement was always a key part of the negotiation. It is also clear from the evidence that any "services rendered" by Daines to ASC, either before or after the formation of the board was connected to the "organization,

development, and operation of [the] ambulatory surgical center."

**7.** Daines also argues that the Release is ambiguous because the term "members" is susceptible to "more than one reasonable interpretation." This argument turns on a theory offered by Daines that there is a distinction between the legal capacity of ASC operating in its pre-board member status and the legal capacity of ASC as a member of the WVSC Board. However, we cannot find in our case law any justification for

¶ 36 Second, the evidence offered by Daines fails to demonstrate how the oral agreement for eight shares does not fall under the clause releasing ASC from "any and all liabilities or claims in connection with services provided ... for the organization, development and operation of an ambulatory surgical center in the West Valley." Daines admits that the oral agreement was made in substitution for the agreement covered by the MOU. The MOU states that Daines will provide ASC with a list of surgeons for the purpose of "building and operating a surgical center." The MOU and the subsequent oral agreement both fall under the plain language of the Release covering "any and all" claims in connection with the "organization, development and operation" of the surgical center. Daines' argument for ambiguity asks us to find that the phrase "any and all" somehow does not encompass his claim under the MOU or the oral agreement for the eight shares or that, conversely, his agreement to provide a list of surgeons for the purpose of "building and operating" a surgical center somehow does not fall under the phrase "organization, development and operation of an ambulatory surgical center." Applying the *Ward* rule and comparing Daines' proposed interpretation with the contractual terms, we find that Daines' argument is not reasonably supported by the language of the Release.

¶ 37 In accordance with the *Ward* rule, we affirm the trial court's directed verdict and find that the Release is unambiguous as a matter of law. As a result, we do not need to resort to the admission of parol evidence on the question of intent, because absent a finding of facial ambiguity, "the parties' intentions must be determined solely from the language of the contract." *Ward*, 907 P.2d at 268. Looking at the language of the contract releasing WVSC "or any of its members" from "any and all liabilities and or claims in connection with services provided" by Daines for the "organization, development, and operation" of the surgical center, we hold that Daines unambiguously released ASC from

any claims he had against it, including his claim for the eight shares under the first oral agreement.

## III. FRAUD

¶ 38 Daines also appeals the trial court's directed verdict on his fraud claim. To prevail on a claim of fraudulent inducement, Daines must present clear and convincing evidence sufficient to establish as follows:

(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35 (quoting *Gold Standard Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996)). Further, a party alleging fraud is required by rule 9(b) of the Utah Rules of Civil Procedure to state the circumstances constituting fraud "with particularity." Utah R. Civ. P. 9(b). Thus, "the mere recitation by a plaintiff of the elements of fraud in a complaint does not satisfy the particularity requirement." *Armed Forces*, 2003 UT 14, ¶ 16, 70 P.3d 35.

¶ 39 Considering the evidence in a light most favorable to Daines, we affirm the trial court's directed verdict on the fraud claim. The trial court held that there was "extremely thin" evidence of a representation made by Vincent regarding the eight shares therefore satisfying the first element of the fraud test. However, the court further found that Daines "has offered no evidence that ASC group had no present intent to transfer the eight shares to [Daines], or that the statement was know-

recognizing a different legal capacity where, as in this case, the legal capacity of ASC as a member of the board was clearly a foundational element for all agreements between ASC and Daines. Moreover, the obligations of ASC to

Daines before and after ASC became a member of WVSC arise from the same nexus: the organization and development of the surgical center. Therefore, the obligations are covered under the Release.

ingly false or recklessly made." Rather than offer evidence satisfying the fraud standard in his appeal, Daines does little more than color the fraud elements with conjectural allegations based on his subjective experience of the transaction. We have held that, "mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient." *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 36, 21 P.3d 198. The evidence presented at trial, as noted by the trial court, failed to meet Daines' burden with respect to his fraud claim.

## IV. VINCENT'S LIABILITY

¶ 40 Daines asks us to reverse the trial court's directed verdict in favor of Vincent on all claims against Vincent personally. Reviewing the evidence and testimony presented at trial in a light most favorable to Daines, we agree with the trial court's ruling that Daines failed to present competent evidence that Vincent was acting in anything other than a representative capacity for ASC in his dealings with Daines. ASC was, at all pertinent times for the purposes of this case, a Utah limited liability company. The Utah Revised Limited Liability Company Act indicates that "no organizer, member, manager, or employee of a company is personally liable … for a debt, obligation, or liability of the company." Utah Code Ann. § 48–2c–601 (2007). Additionally, we have held that "where an agent has signed a contract in a personal capacity, that is, executed it in a manner clearly indicating that the liability is his alone … he must fulfill." *Starley v. Deseret Foods Corp.*, 93 Utah 577, 74 P.2d 1221, 1223 (1938). It follows then that Vincent, as the chairman of ASC during negotiations with Daines, can be held personally liable for a signed contract only if he executed the contract "in a manner clearly indicating that the liability was his alone." *Id.*

¶ 41 We begin with an analysis of the MOU, which represents the starting point of any agreement that Daines had with ASC. Daines drafted the MOU and included a signature line for Vincent directly under the heading "ASC." Because the MOU expressly states that Vincent would sign on behalf of ASC, it is apparent that Daines recognized that he would be dealing with ASC through Vincent and not with Vincent in his individual capacity. The initial term sheets, which include compensation for Daines in accordance with the MOU, also indicate that Vincent was acting on behalf of ASC. The term sheets are also clear on the fact that any compensation that Daines would receive for his "introduction of ASC to [the] project" would come from WVSC once formed and not from Vincent personally. Furthermore, the agreement for eight shares, according to Daines, came about as a renegotiation of the terms of compensation originally considered under the MOU. Daines' testimony of the events of the renegotiation reflects his continued understanding that Vincent was acting on behalf of ASC on December 13, 2000. The pertinent section of Daines' testimony on direct examination reads:

Q: So what was Mr. Vincent's reaction to your conversation with him, to you telling him how uncomfortable you felt?

A: His reaction was, "Well, I think we can take care of this if you come on our side of the table and you get a share."

Even if we are to assume, in a light most favorable to Daines, that Vincent's first "we" is a reference to Vincent and Daines, it is apparent that Vincent's invitation to Daines to "come on our side of the table" is a reference to ASC's position in the negotiations. Daines' testimony confirms his original understanding that Vincent was acting on behalf of ASC during their negotiations. Therefore, we affirm the directed verdict of the trial court.

## V. THE LIPSCOMB ORDER

¶ 42 Daines asks us to consider the trial court's denial of his motion to admit the Lipscomb order. Daines sought to admit the Lipscomb order for two purposes: (1) to impeach Vincent if he were to testify and (2) as evidence in Daines' case-in-chief. We will not consider the first argument because Vincent was not called as a witness.[8] As to the

8. We recognize that Vincent may have been    called as a witness by the defense had ASC and

second argument, Daines concedes that the Lipscomb order constitutes character evidence; he sought its admission under the character evidence rule exception in Utah Rule of Evidence 404(b).

¶ 43 Under Utah Rule of Evidence 404(b), evidence of "crimes, wrongs or acts is not admissible to prove the character of a person." Utah R. Evid. 404(b). However, such evidence may be admissible for some other purpose such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* We have held that the list provided in rule 404(b) is not exhaustive and that evidence is admissible under rule 404(b) "so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged." *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730. However, qualifying under rule 404(b) is not sufficient as to proffered character evidence. In *Allen*, we also held that meeting the rule 404(b) standard is only the first in a three-part test. *Id.* ¶ 16, 108 P.3d 730. Evidence offered under 404(b) must also meet the relevancy requirements of rule 402 and pass the prejudicial balancing test of rule 403. *Id.* However, we need not apply the last two steps of the *Allen* test because Daines' argument falters on the first step.

██ ¶ 44 The Lipscomb order contains several references relevant to Vincent's character.[9] In his brief, Daines argues that the Lipscomb order should have been admitted as "evidence in chief of Vincent's prior bad acts." Daines' argument manifests a fundamental misunderstanding of rule 404(b). Rule 404(b) operates to prevent evidence of a defendant's prior bad acts from coming before a jury to "show conformity therewith,"

which appears to be the reason Daines wanted the Lipscomb order admitted. Daines' argument on this point is sufficient to affirm the trial court's denial. Further, Daines invites us to find "substantive grounds" for a reversal in his memorandum submitted to the trial court without further elaboration. As we have held before, an argument merely referencing submissions to the trial court is "inadequate and does not provide sufficient legal reason for us to override the discretion of the trial court which had the ability to . . . review the documentation on this issue." *Jensen v. Sawyers*, 2005 UT 81, ¶ 134, 130 P.3d 325. Finally, we note that because the trial court assumed for purposes of its ruling that Vincent had orally agreed to the shares Daines claimed, Daines lost nothing by reason of the unavailability of the order.

## VI. DAINES' DAY IN COURT

██ ¶ 45 Daines claims that he was denied his "day in court" by the trial court's directed verdicts. We disagree. In order to succeed in his claim, Daines must demonstrate that his claims have not been adjudicated on the merits. *See, e.g., Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶¶ 65–66, 44 P.3d 663. The record clearly indicates the opposite.

██ ¶ 46 We have held that "a day in court means that each party shall be afforded the opportunity to present claims and defenses, and have them properly adjudicated on the merits according to the facts and the law." *Id.* ¶ 42, 44 P.3d 663 (footnote omitted). "The 'merits' of a case are 'the elements or grounds of a claim or defense.'" *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality*, 265 F.App'x 203, 207, 2008 WL 344750 (5th Cir.2008) (quoting *Black's*

Vincent not prevailed on their motions for directed verdicts. However, admission of the Lipscomb order would not have aided Daines in his claim. Daines asked the court to admit the Lipscomb order as evidence demonstrating that Vincent has a history of making oral agreements and then subsequently denying them. As noted earlier, the trial court assumed the existence of the oral contract of December 13, 2000, in spite of the court's "serious doubts [as to] whether there is a reasonable basis in the evidence to support a finding that an enforceable oral contract was formed." Assuming the existence of the oral

agreement, the trial court found that it would not be binding due to the all-inclusive nature of the Release. Consequently, allowing the Lipscomb order would not have aided Daines since the point he sought, an affirmation of the existence of the oral agreement, could not have overcome the unambiguous language of the Release. *See* discussion *supra* 33–37.

9. The order notes that Vincent has "convenient lapses of memory" and that Vincent was "not a credible witness."

*Law Dictionary* 1010 (8th ed.2004). With regard to a judgment on the merits, we have clarified our standard by stating that "a judgment on the merits may be made at any stage of the litigation, so long as the district court rendered judgment based upon a proper application of the relevant law to the facts of the case." [10] *Miller,* 2002 UT 6, ¶ 42 n. 6, 44 P.3d 663.

¶ 47 Daines received rulings on the elements and grounds of his claim based on the trial court's proper application of the relevant law to the facts of the case. The directed verdicts were not rendered until after Daines presented his entire case to the court. It was not until after Daines indicated that he would not call any more witnesses that the court heard motions for directed verdicts by ASC and Vincent. The record indicates that the court carefully listened to the testimony and evidence during Daines' presentation. After Daines' presentation of evidence the court noted, "I don't think you've proven any malfeasance or anything by way of breach of contract on Mr. Vincent." The trial court then allowed Daines the opportunity to address the court's concerns. While considering directed verdicts, the court carefully sought through the record to identify even a "scintilla of evidence that would support [Daines'] claim that could go to the jury." It was only after the court's deliberation on Daines' presentation and arguments on the merits that it granted the directed verdicts based on application of the appropriate law to each of Daines' claims. The trial court's directed verdicts did not deny Daines his day in court. To the contrary, the record indicates that the trial court was careful to ensure it applied the appropriate law to the facts presented by Daines before rendering its judgment.

## VII. AWARD OF COSTS

■■■■ ¶ 48 We conclude that the award of costs to ASC and Vincent is appropriate pursuant to rule 54 of the Utah Rules of Civil Procedure. Rule 54(d)(1) indicates that "costs shall be awarded as a matter of course to the prevailing party unless the court directs otherwise." Utah R. Civ. P. 54(d)(1). The trial court's orders are clear that ASC and Vincent prevailed on their motions for directed verdicts.

¶ 49 We find also that ASC and Vincent timely complied with rule 54(d)(2)'s requirement in serving a copy of the memorandum of cost. The final appealable judgment awarding costs was entered by the trial court on October 11, 2006. ASC and Vincent had previously served a copy of the memorandum of costs to Daines, on September 11, 2006, and Daines signed for receipt of the memorandum on September 12, 2006. Even though it appears from the record that the trial court failed to sign the final order fixing the amount of costs, it is clear from the judgment that the trial court awarded costs to ASC and Vincent. Therefore we find that the award of costs in the amount of $3,842.11 to ASC and Vincent is appropriate as required by rule 54 of the Utah Rules of Civil Procedure.

## CONCLUSION

¶ 50 In accordance with our recent ruling in *Tangren,* we affirm the trial court's finding that the Release signed by Daines was an integrated contract. We also affirm the trial court's finding in accordance with *Ward,* that the Release was unambiguous as a matter of law. Additionally, we affirm the trial court's directed verdicts on Daines' claims of fraud and against Vincent individually. We also affirm the trial court's denial of Daines' motion to admit the Lipscomb order. Further, we find that Daines had his day in court as his claims were adjudicated on the merits. Finally, in accordance with rule 54 of the Utah Rules of Civil Procedure, we affirm the award of costs in the amount of $3,842.11 to ASC and Vincent.

10. If the trial court had held in a pretrial summary judgment in accordance with *Ward* that the Release was unambiguous as a matter of law, Daines would still have had his day in court. As we stated previously, the elements of Daines' claim fail to meet the ambiguity standard we articulated in *Ward.* Therefore, the trial court could have correctly held that the presentation of extrinsic evidence to a jury on the question of ambiguity with regard to intent would not be appropriate under *Ward.*

¶ 51 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.