2014 UT App 17

**HOLLADAY BANK & TRUST,
Plaintiff and Appellee,**

v.

**GUNNISON VALLEY BANK,
Defendant and Appellant.**

No. 20120400-CA.

Court of Appeals of Utah.

Jan. 24, 2014.

V. Lowry Snow, Curtis M. Jensen, and Jonathan P. Wentz, St. George, Attorneys for Appellant.

Gerald H. Suniville and Alex B. Leeman, Salt Lake City, Attorneys for Appellee.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges JAMES Z. DAVIS and CAROLYN B. McHUGH concurred.

ROTH, Judge:

¶ 1 This case involves a contract dispute between two banks. Defendant Gunnison Valley Bank (Gunnison) financed a substantial home loan, secured by a deed of trust, and Holladay Bank & Trust (Holladay) acquired a participation interest in the loan soon thereafter. When the borrower defaulted, Gunnison purchased the secured property at a foreclosure sale. The property proved to be worth less than the amount of the loan, however, and the banks disagreed about how their contract allocated the risk of insufficient collateral proceeds. Gunnison argued that their contract allocated the proceeds of collateral proportionally according to the banks' respective ownership interests in the loan. Holladay argued that their contract provided that Holladay was entitled to all principal payments from whatever source—including collateral proceeds—until its initial investment had been recouped. The district court agreed with Holladay and granted its motion for summary judgment. We reverse and remand.

## BACKGROUND

¶ 2 In April 2007, Gunnison agreed to finance the construction of a $1.6 million resi-

dence in Utah County. The loan was secured by a trust deed on the property. Soon after issuing the loan, Gunnison entered into a loan participation agreement (the contract) with Holladay, which purchased a 31.25% interest in the loan for $500,000. The contract required Gunnison to "fund its portion of the Loan first," and only after Gunnison had "disbursed its full commitment to the Borrower" would Holladay "begin disbursing its portion of the Loan." Holladay wired its portion of the loan to Gunnison in January 2008, and the borrower defaulted later that year. Gunnison purchased the borrower's property at a foreclosure sale in October 2009.

¶ 3 The value of the property was insufficient to cover the balance on the loan, however, and the banks were unable to reach an agreement about the allocation of any proceeds Gunnison might receive from selling the property. Holladay claimed that the contract provided for principal repayment on a "last-in, first-out" basis, meaning that Holladay, which had funded its portion of the construction loan last, was entitled to all collateral proceeds until its $500,000 investment was repaid, with Gunnison to receive the remainder. Gunnison asserted that the contract provided for Holladay to have first call on the borrower's principal payments while the loan remained current but that on default the proceeds of collateral were to be distributed according to each bank's proportional interest in the loan. Holladay filed a declaratory judgment action in April 2011, asking the court to resolve the issue. The parties then filed cross-motions for summary judgment. At issue were the following three clauses in the contract, with our emphasis on the most pertinent language:

> 6. SERVICING FEE: [Gunnison] shall not charge a servicing fee. Instead, *the Loan will be participated on a "last in, first out" basis,* by [Holladay].

> For purposes of this agreement, *"last in, first out" basis, means that [Gunnison] will fund its portion of the Loan first. Once [Gunnison] has disbursed its full commitment to the Borrower, [Holladay] will then begin disbursing its portion of the Loan up to and until the full amount of [Holladay's] commitment has been dis-*

*bursed,* as long as the necessary loan to value and percentage of construction that has been completed are maintained.

> *As the Borrower repays the Loan,* [Gunnison] and [Holladay] will receive interest in proportion to their respective balances and percentage ownership interests in the loan. *Principal payments will be applied first to the balance of [Holladay] until [Holladay's] disbursed principal and interest have been fully paid and satisfied.* Once [Holladay's] disbursements of principal have been fully paid, together with all interest and any and all reasonable costs duly satisfied, [Gunnison] will receive the balance of the loan proceeds. Loan fees, extension fees and expenses, if any, shall be paid promptly upon receipt thereof from the Borrower to [Gunnison] and [Holladay] in accordance with paragraph 4, above or elsewhere in this agreement, or, if not specified in this agreement, then in proportion to their respective percentage ownership interests in the Loan.

> . . . .

> 12. APPLICATION OF PAYMENTS: *All loan payments received* shall be applied, first, to reimburse [Gunnison] for reasonable costs and expenses (including reasonable attorney's fees) incurred by [Gunnison] in enforcing the terms of the Loan, collecting the amounts owed thereunder, and protecting the interests of [Gunnison] and [Holladay] in the Loan and in the collateral given as security for the Loan. *All other amounts received under the Loan shall be divided between [Gunnison] and [Holladay] (as late fees, principal or interest as provided in the Loan documents) in accordance with their respective percentages of ownership interest in the Loan, but specifically subject to the provisions of paragraph 6, above.*

> . . . .

> 13C. [Gunnison], however, *agrees that the proceeds of all collateral directly securing repayment of the loan, shall be applied first to the payment of the Loan in-full as provided in paragraph 12 above.* Any excess proceeds may be applied by [Gunnison] to the payment of any other or additional loans then owing to [Gunnison], that

may be indirectly secured by such collateral as a result of the inclusion of "cross-collateralization" in the security agreement executed in connection with Loan in favor of [Gunnison].

¶ 4 Each party argued that the contractual language unambiguously supported its position. Holladay asserted that paragraph 6—the "last in, first out" (LIFO) provision—applied to any and all principal repayments, including payments from collateral proceeds. By contrast, Gunnison claimed that paragraph 6 applied only to payments received from the borrower while the loan was current and not to repayment of principal out of the proceeds of collateral after default, which was governed (through application of paragraph 13C) by paragraph 12's language providing for proportional allocation of "[a]ll ... amounts received under the Loan ... as late fees, principal or interest." Gunnison argued that paragraph 12's qualifier that it was "specifically subject to the provisions of paragraph 6" had to be read in the context of paragraph 6's reference to "Borrower" repayment. Holladay contended that the provision meant that principal was to be paid on a last-in, first-out basis, whatever its source.

¶ 5 Gunnison also argued in the alternative that the contract was ambiguous and that extrinsic evidence of the parties' intent regarding the allocation of collateral proceeds supported its interpretation. In support of this position, Gunnison submitted affidavits from Gunnison's vice president at the time of the agreement and from the president and CEO of Holladay during the same period. Both affidavits stated that the parties intended to distribute proceeds from the sale of collateral in proportion to their respective ownership interests in the loan.

¶ 6 The district court ruled that the contract was unambiguous and declined to consider the affidavits Gunnison submitted with its motion. It then ruled that "giving effect to all of the provisions of the contract, it is clear that the 'last in first out' repayment scheme applies to proceeds received whether through repayment by the borrower or by default and sale of collateral." Gunnison appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 7 Gunnison argues that the district court erred when it granted Holladay's motion for summary judgment because the contract's language unambiguously supports Gunnison's interpretation. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). "We review the district court's decision to grant summary judgment for correctness." *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 10, 232 P.3d 1059. The interpretation of an unambiguous contract is a question of law that we also review for correctness. *Hillcrest Inv. v. Sandy City*, 2010 UT App 201, ¶ 7, 238 P.3d 1067.

¶ 8 In the alternative, Gunnison argues that the contract is ambiguous and the district court should have considered the affidavits it submitted with its motion for summary judgment. "Determining whether a contract is ambiguous presents a threshold question of law," which is reviewed for correctness. *Interwest Constr. v. Palmer*, 923 P.2d 1350, 1358 (Utah 1996).

## ANALYSIS

¶ 9 We conclude that the contract is ambiguous regarding the distribution of collateral proceeds because its pertinent terms are "capable of more than one reasonable interpretation." *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted). For that reason, we also conclude that the district court should have considered extrinsic evidence to determine the parties' intent.

¶ 10 The central dispute in this case is how the contract controls the distribution of collateral proceeds. Paragraph 13C provides that "the proceeds of all collateral directly securing repayment of the loan, shall be applied first to the payment of the Loan in-full as provided in paragraph 12 above." Paragraph 12 allows Gunnison to collect reasonable expenses and enforcement costs from each loan payment received but distributes all other loan proceeds proportionally, subject to paragraph 6. Paragraph 12 states,

All loan payments received shall be applied, first, to reimburse [Gunnison] for reasonable costs and expenses ... incurred by [Gunnison] in enforcing the terms of the Loan.... *All other amounts received under the Loan* shall be divided between [Gunnison] and [Holladay] (*as late fees, principal or interest* as provided in the Loan documents) in accordance with their respective percentages of ownership interest in the Loan, *but specifically subject to the provisions of paragraph 6 above.*

(Emphasis added.) And paragraph 6 requires that Holladay receive all principal payments until its investment is fully repaid:

*As the borrower repays the Loan,* [Gunnison] and [Holladay] will receive interest in proportion to their respective balances and percentage ownership interests in the loan. *Principal payments will be applied first to the balance of [Holladay] until [Holladay's] disbursements of principal have been fully paid and satisfied.* Once [Holladay's] disbursements of principal have been fully paid, together with all interest and any and all reasonable costs duly satisfied, [Gunnison] will receive the balance of the loan proceeds.

(Emphasis added.)

¶ 11 The parties disagree about how paragraph 12's reference to paragraph 6 affects the allocation of collateral proceeds. Holladay argues that because paragraph 6's LIFO language refers directly to "[p]rincipal payments," any amounts collected that repay principal—including proceeds of collateral—are allocated between the parties on a LIFO basis. Gunnison argues that Holladay's interpretation ignores paragraph 12's specific reference to "principal" (along with late fees and interest) as "amounts received under the loan" that are to be allocated proportionally among the parties. Under Gunnison's reading, paragraph 12's reference to paragraph 6 does not subject the distribution of collateral proceeds to the LIFO provision. Rather, the paragraph 6 reference "denote[s] an exception" to paragraph 12's general rule of proportional allocation—an exception that applies exclusively to principal payments made by the borrower while the loan is current, not to collateral proceeds generated after default.

¶ 12 In interpreting a contract, appellate courts "look to the writing itself to ascertain the parties' intentions." *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 12, 6 P.3d 1129. A contract is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Daines*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citations and internal quotation marks omitted). But terms are not ambiguous "simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428. Rather, "the proffered alternate interpretation ... must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction." *Id.* (citation and internal quotation marks omitted). "When an ambiguity exists [in a contract], the intent of the parties becomes a question of fact," *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 (citation and internal quotation marks omitted), and courts "may consider extrinsic evidence to determine" the contract's meaning, *Interwest Constr. v. Palmer*, 923 P.2d 1350, 1359 (Utah 1996).

¶ 13 Here, the pertinent contractual provisions that govern the distribution of principal payments and collateral proceeds are "capable of more than one reasonable interpretation." *See Daines*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted). The district court agreed with Holladay and determined that the LIFO provision in paragraph 6 applies to collateral proceeds, reasoning that "[p]aragraphs 12 and 13 clearly apply in default circumstances, and paragraph 12 refers back to the [LIFO] payment provisions specified by paragraph 6." The court concluded that the only way to give "effect to all of the provisions of the contract" was therefore to hold that the LIFO "repayment scheme applies to proceeds received whether through repayment by the borrower or by default and sale of collateral."

¶ 14 The district court's interpretation of the contract is not "the result of a forced or strained construction" of its pertinent provisions. *See Saleh*, 2006 UT 20, ¶ 17, 133 P.3d 428 (citation and internal quotation marks omitted). Rather, the contract contains language that seems to characterize the entire scope of Holladay's relationship with Gunnison as "last in, first out," rather than establishing only a limited exception for borrower principal repayments. For example, paragraph 6 indicates that "the Loan will be participated on a 'last in, first out' basis, by [Holladay]" and that "[p]rincipal payments will be applied first to the balance of [Holladay] until [Holladay's] disbursed principal and interest have been fully paid and satisfied." And paragraph 12's provisions regarding the application of "amounts received under the loan ... as late fees, principal or interest" can be read as "specifically subject to" paragraph 6. Considering each provision "in relation to all of the others," *see Cafe Rio, Inc. v. Larkin–Gifford–Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (citation and internal quotation marks omitted), paragraph 13C's direction that "the proceeds of all collateral ... shall be applied ... to the payment of the Loan in-full as provided in paragraph 12" could reasonably be read to include collateral proceeds as one type of principal payment to which paragraph 6's LIFO provision applies. *See Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 ("In evaluating whether the plain language [of a contract] is ambiguous, we attempt to harmonize all of the contract's provisions and all of its terms."). After all, one way a borrower might ultimately repay a loan is through the sale of collateral the borrower pledged to secure payment of the underlying debt.

¶ 15 But the district court's approach, while reasonable, is not the only way to interpret the agreement. In fact, it may be just as reasonable to read paragraphs 6, 12, and 13C as establishing a general rule of proportional allocation for all loan proceeds—including proceeds of collateral—with an exception for borrower repayments made before default. Paragraph 13C, the only provision that expressly mentions collateral proceeds, states that the proceeds of collater-

al "shall be applied ... as provided in paragraph 12." Paragraph 12 allows Gunnison to deduct the costs and expenses of enforcing the contract from all loan payments and then provides that "[a]ll other amounts received under the Loan shall be divided" between the parties "as late fees, principal or interest ... in accordance with their respective percentages of ownership interest in the Loan," subject only to paragraph 6. This language can support an inference that the parties anticipated that during the course of the loan, circumstances could arise in which principal would be allocated proportionally among the parties. If the proviso that follows—"but specifically subject to the provisions of paragraph 6, above"—is read to subject all principal recoveries to LIFO, as Holladay argues, it arguably defeats the proportional allocation of principal that was set up as an apparently general rule in the preceding clause. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 28, 210 P.3d 263 (declining to interpret a contract in a way that rendered "any provision meaningless").

¶ 16 While paragraph 6 does provide that Gunnison will not receive any principal payments until "[Holladay's] disbursements of principal have been fully paid," that language can be read to fall within the constraints of the introductory clause, "As the Borrower repays the loan." And paragraph 6's direction that "[l]oan fees, extension fees and expenses, if any, shall be paid promptly *upon receipt thereof from the Borrower*" suggests that paragraph 6 applies only in the context of ongoing borrower repayments. The concept of borrower repayment contemplated by paragraph 6 seems to fit the context of a performing loan where the borrower is making regular payments but may not fit nearly as well the circumstances where the repayment of principal results from the forced disposition of collateral after the borrower's own payments have stopped. Therefore, in light of paragraph 12's proportional allocation of principal and paragraph 13C's directive that collateral proceeds "shall be applied ... as provided in paragraph 12"—not paragraph 6—that phrase arguably limits paragraph 6's application to borrower payments made before default rather than sub-

jects all principal payments to LIFO. Read this way, paragraphs 6, 12, and 13C could arguably establish a general rule of proportional allocation, with a LIFO exception that applies only to borrower repayments while the loan is performing and not to collateral proceeds realized only after the borrower's default.

¶ 17 Additionally, the contract can arguably be read as a whole to establish a general rule of proportional allocation to which LIFO is a specific exception. Paragraph 4 divides $20,000 in loan fees proportionally, allocating $13,750 (68.75%) to Gunnison and $6,250 (31.25%) to Holladay. It further provides that extension fees "shall be shared by [Gunnison] and [Holladay] in proportion to their respective percentage ownership interests in the Loan." Paragraph 12 allocates "[a]ll other amounts received under the Loan ... as late fees, principal or interest" proportionally, and paragraph 13D entitles Holladay to "share" proceeds from the sale of other collateral that Gunnison decides to apply to the loan. Even paragraph 6, which contains the LIFO provision, directs that "[l]oan fees, extension fees and expenses, if any, shall be paid ... in accordance with paragraph 4, above or elsewhere in the agreement, or, *if not specified in this agreement, then in proportion to their respective percentage ownership interests in the Loan.*" (Emphasis added.) Indeed, other than paragraph 6's provision that Holladay will receive all principal payments on a LIFO basis "[a]s the Borrower repays the Loan," all other loan payments and proceeds are allocated proportionally.

 ¶ 18 Even if Gunnison's interpretation is arguably more reasonable than Holladay's and the district court's, that does not mean the contract is unambiguous. So long as competing interpretations are reasonably based on the natural and ordinary meaning of the terms of the contract and generally consistent with interpretive canons, both fall within the permissible spectrum of reasonability that courts use to determine ambiguity. *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428; *see also Merrick Young Inc. v. Wal–Mart Real Estate Bus. Trust*, 2011 UT App 164, ¶ 18, 257 P.3d 1031 ("To be ambiguous, both interpretations must be plausible in the context of the contract as a whole."). Despite evidence in the contract's structure and pertinent terms supporting Gunnison's position, paragraph 6 still contains language that cuts the other way, appearing to characterize the parties' entire relationship as LIFO, not just the allocation of principal payments while the loan is current, particularly paragraph 6's introductory language, which states that "the Loan will be participated on a 'last in, first out' basis, by [Holladay]." Gunnison's reading of the contract does not account for this rather comprehensive characterization of the nature of Holladay's participation, and interpreting the contract's pertinent provisions with this in mind supports a reasonable conclusion that collateral proceeds are subject to LIFO. At the same time, Holladay cannot fully explain why, if the parties intended to allocate proceeds of collateral on a LIFO basis, they decided to include a reference in the contract's only default provision to a paragraph that allocates loan proceeds proportionally.

¶ 19 Under Holladay's interpretation, drafting paragraph 12 to include a proviso making it subject to paragraph 6 may simply have been an inartful way for the parties to not only provide Holladay with an accelerated payout of its investment in the loan, but also to reduce Holladay's risk on default. Under Gunnison's reading, it may have been a way to maximize Holladay's return on investment by giving it the benefit of "last in, first out" so long as the loan was current, but requiring it to share the risk with Gunnison if the borrower defaulted. Both approaches are arguably commercially reasonable and find support in the language and structure of the contract. But without more evidence of the parties' actual intent, it is impossible to conclusively rule out either possibility; even if one approach seems more likely than another, neither is unreasonable. Consequently, the natural meaning of the language in the contract is "capable of more than one reasonable interpretation," *see Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted), and the contract is therefore ambiguous.

¶ 20 Where a contract is ambiguous, summary judgment is appropriate only if extrinsic evidence of the parties' intent, "viewed in the light most favorable to the nonmoving party, leaves no genuine issues of fact to be resolved." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 24, 48 P.3d 918. The only extrinsic evidence in the record regarding the parties' intent is the affidavit testimony Gunnison submitted to the district court, and both affidavits indicate that the parties intended to share collateral proceeds according to their respective ownership interests and not on a LIFO basis. Holladay provided no contrary evidence, nor did it file a formal rule 56(f) motion to conduct additional discovery.

¶ 21 For the following reasons, however, we conclude that remand is appropriate rather than a final ruling in Gunnison's favor. First, Holladay requested "the opportunity, pursuant to Utah R. Civ. P. 56(f), to conduct discovery on the parties' intent" in its memorandum opposing Gunnison's motion for summary judgment. At a subsequent hearing on the motion, Holladay's counsel acknowledged that this request was insufficient, but he pointed out that Gunnison submitted the affidavits after the close of discovery and asked for leave to file a rule 56(f) motion if the court ruled that the contract was ambiguous. The court ruled that the contract was unambiguous, mooting Holladay's request. It is therefore unclear whether the court would have allowed Holladay to offer extrinsic evidence if it had determined, as we do, that the contract is ambiguous.

¶ 22 Second, Holladay raised some credibility concerns about Gunnison's affiants that were also left unresolved due to the nature of the court's ruling. It has become something of an appellate truism that appellate courts leave credibility determinations to the district courts because they "are in the best position to assess the credibility of the witnesses and to gain a sense of the proceeding as a whole." *Valcarce v. Fitzgerald,* 961 P.2d 305, 314 (Utah 1998). Finally, on appeal Gunnison has not asked this court to resolve ambiguities in the contract and order entry of summary judgment in its favor. Rather, in both its opening brief and reply brief, it requests that the summary judgment ruling

"be vacated and the case remanded for consideration of extrinsic evidence offered as to the intent of the parties." We see no compelling reason to go beyond the requested relief and therefore remand the matter to the district court to consider appropriate evidence as to the parties' intent with regard to the distribution of the proceeds of collateral under their agreement. How the district court approaches this task is left to its best judgment under all the circumstances.

CONCLUSION

¶ 23 We conclude that the contract is ambiguous regarding the allocation of collateral proceeds between the parties. We therefore vacate the district court's order awarding summary judgment to Holladay and remand for consideration of extrinsic evidence regarding the parties' intent.