**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 4, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

    v.

BRUCE LEE DUNN; HELEN C. DUNN;
OAKLAND HOMES OF UTAH, a
Montana Corporation; DELLA MADSEN;
GAYLE L. HUNTING; DAVID R.
GUNDERSON; JOANNE GRANGER,
Trustee of the Johannah M. Hafen Family
Trust; PAUL A. MANCINA, JR., as
Personal Representative of the Estate of
Frances Mancina, deceased; STEPHEN C.
JACOBSEN; CHARLYNN J.
DALEBOUT; HELEN L. WATTS; JOHN
A. WATTS, a/k/a John Andrew Watts;
HILDA M. MADSEN; GLADYS P.
BUTLER; LAZY CP "P" LIMITED
PARTNERSHIP; TIMOTHY ALLEN
HURST, Trustee of the Timothy Allen
Hurst Trust; TRUSTEE OF THE
GUNDERSON LEOAN M FAMILY
TRUST; ALICE M. PANNIER; JOHN R.
WOOLSEY; LILLIE E. WOOLSEY;
RICHARD DUNN,

      Defendants - Appellees.

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

No. 07-4197

v.

No. 07-4199

GAYLE L. HUNTING; DAVID R. GUNDERSON; PAUL A MANCINA JR., as Personal Representative of the Estate of Frances Mancina, deceased; STEPHEN C. JACOBSEN; CHARLYNN J. DALEBOUT; HELEN L. WATTS; JOHN A. WATTS,  AKA John Andrew Watts; HILDA M. MADSEN,

Defendants - Appellants.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**(2:99-CV-00145-TS)**

In Case Number 07-4197:
John E. Arbab, Attorney, Appellate Division, United States Department of Justice, Washington, DC (Ronald J. Tenpas, Assistant Attorney General, and David C. Shilton, Attorney, Appellate Division, United States Department of Justice, Washington, DC; and Christopher B. Rich, United States Department of the Interior, Salt Lake City, Utah), appearing for Appellant United States.

E. Jay Sheen, West Jordan, Utah, appearing for Appellees Dunn/Pannier, et al.

Steven R. Paul (Brent R. Armstrong, with him on the briefs), Armstrong Law Offices, P.C., Salt Lake City, Utah, appearing for Appellees Jacobsen, et al.

In Case Number 07-4199:
E. Jay Sheen, West Jordan, Utah, appearing for Appellants Dunn/Pannier, et al.

Steven R. Paul (Brent R. Armstrong, with him on the briefs), Armstrong Law Offices, P.C., Salt Lake City, Utah, appearing for Appellants Jacobsen, et al.

John E. Arbab, Attorney, Appellate Division, United States Department of Justice, Washington, DC (Ronald J. Tenpas, Assistant Attorney General, and David C. Shilton, Attorney, Appellate Division, United States Department of

-2-

Justice, Washington, DC; and Christopher B. Rich, United States Department of the Interior, Salt Lake City, Utah), appearing for Appellee United States.

---

Before **HENRY**, Chief Circuit Judge, **TACHA**, and **MURPHY**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

The United States instituted this action to quiet title to approximately 205 acres of land adjoining the Scofield Reservoir, a federal reservoir located in Carbon County, Utah. Only a portion of that property ("the disputed property") is at issue in this appeal. The district court quieted title to the disputed property in the United States but concluded that the property is subject to a use right that permits the defendants to build fences and semi-permanent structures on the property. The United States appeals the district court's determination that a use right exists, as well as the district court's interpretation of the scope of that use right. Certain defendants appeal the district court's denial of their motion to stay the proceedings to allow them to pursue claims under the Color of Title Act, *see* 43 U.S.C. §§ 1068–1068b, and to pursue a mandamus action against the Secretary of the Interior. *See* 28 U.S.C. § 1361. Taking jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's decision in denying the motion to stay. We REVERSE the district court's conclusion that the disputed property is subject to a use right.

## I. BACKGROUND

-3-

A.    The Parties and the Property at Issue

Several defendants are involved in this quiet title action. All of them are successors in interest to brothers Neil M. and Andrew C. Madsen ("the Madsen brothers"), and all of them claim an interest in a portion of the disputed property. The defendants have divided themselves into two groups that have retained separate counsel. We will refer to these groups as the "Jacobsen defendants" and the "Dunn and Pannier defendants." These groups do not have claims adverse to each other; their claims are adverse only to the United States's claims.

The disputed property is located in section 10, township 12 south, range 7 east, Salt Lake Meridian. A railroad right-of-way crosses through the extreme southern portion of section 10, beginning in a northerly route from the south end of the section near the southwest corner and then continuing in an easterly route toward section 11. The disputed property lies directly west and north of the right-of-way in the south half of the southwest quarter of section 10, and directly north of the right-of-way in the southwest quarter of the southeast quarter of section 10. The disputed property lies below the elevation contour line of 7630 feet and is generally lower in elevation than the land on the opposite side—that is, to the south and east—of the right-of-way. *See* Appendix.[1]

_____

[1]The Appendix is a map of section 10 taken from the United States's trial exhibit 7a. The disputed property is represented by the shaded area on the map, excluding the shaded area that represents the Scofield Dam in the southeast quarter of the southeast quarter of section 10.

The relevant title history for the disputed property begins in 1927. That year, E.B. and Gertrude Jorgensen held fee simple title to various portions of section 10, including the disputed property. The Jorgensens also held title to various other lands in nearby sections. Over three days in September 1927, the Jorgensens executed three deeds that conveyed a variety of interests to three separate grantees: the Denver & Rio Grande Western Railroad Company; the Madsen brothers; and the Price River Water Conservation District ("PRWCD"), which owned and operated a smaller predecessor reservoir (the "PRWCD Reservoir") to what is now Scofield Reservoir.

On September 20, 1927, the Jorgensens conveyed a railroad right-of-way to the Denver & Rio Grande Western Railroad Company, including the right-of-way that forms the south and east border of the disputed property. On September 21, the Jorgensons quitclaimed certain interests in sections 10, 11, 16, 17, 20, 21, 28, and 29 to the Madsen brothers. That deed ("the Madsen deed") does not include a description of the disputed property. It does, however, contain the use-right provisions at issue in this appeal—namely, the right "to use any part or portion of said subdivisions of land below and between the said 7630 contour line and the water line of [the PRWCD Reservoir], when the same are not actually covered by the water therein, for any and all purposes not inconsistent with the flowage and storage of water thereon . . . ." On September 22, the Jorgensens conveyed by warranty deed the disputed property and other parcels of land to PRWCD. That

-5-

deed (the "PRWCD deed") states that the conveyance is subject to the use rights previously granted in the Madsen deed.

In 1945, when it was building the Scofield Dam, the United States obtained a quitclaim deed from PRWCD. That deed conveyed various tracts of land, including PRWCD's interest in the disputed property, to the United States.

From the time of the three Jorgensen conveyances in 1927, the Madsen brothers used the disputed property to farm and to graze livestock. Beginning in 1945 with the construction of the Scofield Dam, the Madsen brothers and their successors or grantees—including the defendants in this case—have constructed boat camps, homes, semi-permanent cabins, and fences on the disputed property. If the existing structures were threatened with inundation from the Scofield Reservoir,[2] heavy equipment would likely be required to move some of them.

B.    The Quiet Title Action

The United States instituted the quiet title action in March 1999 after defendant Bruce Dunn began erecting a modular home on the disputed property. In their answers, the defendants asserted counterclaims alleging that they have an interest in certain property in section 10. On December 10, 2004, the United States moved for summary judgment, arguing that the use rights in the Madsen

_____

[2]The disputed property lies below the 7630 contour line, which, using a more recent method of measuring elevation, is 7634.6 feet above sea level. The historic high water level recorded to date in the Scofield Reservoir is 7621.5 feet, although it is possible for the water to reach 7636.5 feet.

deed did not apply to the disputed property or to any of the 205 acres of land to which the United States sought to quiet title. In response, the Jacobsen defendants contended that the ambiguity of the Madsen deed created a genuine issue of material fact precluding summary judgment. The Dunn and Pannier defendants argued that, for all land described in the 1927 Madsen and PRWCD deeds, the Jorgensens intended to grant inundation rights to PRWCD and use rights to the Madsens.

On July 28, 2005, the district court orally granted the summary judgment motion in part and denied it in part. In written findings of fact and conclusions of law, filed on January 5, 2006, the court quieted title to all of the 205 acres in the United States. The court, however, denied summary judgment on the United States's claim that the defendants have no use rights in the disputed property. The court wrote that the Madsen deed is "ambiguous as to whether or not, for the [disputed property], the Madsen grantees and their successors were given any of the reserved rights to use those lands . . . as was more clear for the different lands described in later paragraphs of that deed." The district court explained that its

> conclusion of ambiguity is supported by those in the Bureau of Reclamation who over the years since the federal acquisition have interpreted the language in the federal chain of title to give the Madsen successors such a reserved right, as well as by the conduct of the parties in not earlier pursuing final resolution of the title status in a more timely manner, suggesting that no one had an absolute sense of confidence in their title claims.

The court reserved for a bench trial the issues of whether the defendants had a use

-7-

right, and if so, the parameters of the right.

In April 2007, the district court held a two-day bench trial. The court heard extrinsic evidence relating to whether the use-right provision in the Madsen deed applied to the disputed property. On July 16, 2007, the court issued its findings of fact and conclusions of law. The court concluded that the Jorgensens intended to grant the Madsens a use right in the disputed property. *United States v. Dunn*, No. 2:99-cv-145-TS, 2007 WL 2084834, at *9 (D. Utah July 16, 2007). The court also determined that the use right allowed the defendants to erect fencing and certain semi-permanent structures on the disputed property. *Id.* at *12.

C.    The Jacobsen Defendants' Motion to Stay

On July 28, 2005, immediately after the district court's oral summary judgment ruling, the Dunn and Pannier defendants moved to stay the proceedings so that they could "pursue administratively their rights under the Color of Title Act, [43] U.S.C. § 1068." On October 5, 2005, the district court granted the motion. The following day, the Jacobsen defendants joined in the motion to stay.

The district court held a status conference on February 21, 2006. During the conference, the Jacobsen defendants stated that they had filed applications under the Color of Title Act ("CTA") but had not yet received a response from the Department of the Interior ("DOI"). The court asked the defendants to submit a status report by the end of April.

The defendants did not file a status report. Instead, on May 2, 2006, the

United States filed a status report and a motion to set a trial schedule. The United States explained that since the last conference with the court, the DOI had informed the Jacobsen defendants[3] that their applications faced several obstacles. In particular, the DOI explained that: (1) the ongoing quiet title action precluded the DOI from acting on the application; (2) the property at issue did not meet the definition of "public land"; and (3) because the property was not "public land," the Bureau of Land Management ("BLM"), an agency within the DOI, lacked the authority to issue a patent.

On June 5, 2006, the court held a scheduling conference. It set the trial for December 19 but requested that the defendants keep the court updated on the CTA applications. After the BLM continued to assert that it could not take any action on the Jacobsen defendants' applications, the Jacobsen defendants filed a status report on November 9. They requested "leave of the Court to file a Motion for Writ of Mandamus seeking relief from this Court under the Mandamus and Venue Act [28 U.S.C. § 1361]" in order to "compel [the Secretary of the Interior] to perform a duty owed" to them. The Jacobsen defendants also requested another stay of the proceedings, while they pursued their CTA applications. At a status conference on November 13, the district court informed the Jacobsen defendants that they could file the requested motion but that the court could not take any action against a party that was not currently before the court. The court

---

[3]The Dunn and Pannier defendants never filed CTA applications.

rescheduled the trial for April 23, 2007, but it did so primarily because the Dunn and Pannier defendants did not have counsel. The court stated that "[t]he Court makes it clear that it will not continue this trial again."

On March 15, 2007, one of the Jacobsen defendants, Paul A. Mancina, filed a separate lawsuit in the District of Utah seeking a writ of mandamus against the Secretary of the Interior under 28 U.S.C. § 1361. The action was assigned to a different district court judge.[4] On March 20, the Jacobsen defendants moved the court in the quiet title action to vacate the trial date and stay the proceedings so that they could pursue their CTA claims and mandamus action. On April 2, the court denied the motion and proceeded to trial.

D.    Consolidation of These Appeals

Both the Jacobsen defendants and the United States have appealed to this court. The Jacobsen defendants contend that the district court abused its discretion in denying their March 2007 motion to stay the proceedings. The United States contests the district court's conclusion that the defendants have a use right in the disputed property. In the alternative, the United States maintains that if any use right exists, that right does not permit the defendants to erect fencing and semi-permanent structures on the disputed property. Those appeals have been consolidated into this single appeal. We begin by addressing the motion to stay.

_____

[4]That action has since been stayed, pending resolution of this appeal.

-10-

## II. DISCUSSION

A.    Motion to Stay

We review a district court's denial of a motion to stay proceedings for abuse of discretion. *Reed v. Bennett*, 312 F.3d 1190, 1193 n.1 (10th Cir. 2002). "Under the abuse of discretion standard, we will not disturb a trial court's decision absent 'a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 482 (10th Cir. 1995) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

The Jacobsen defendants' motion to stay was premised on applications they filed pursuant to the CTA, 43 U.S.C. §§ 1068–1068b. The CTA permits, and in some circumstances requires, the DOI to issue a patent for a tract of "public land" not to exceed 160 acres, if specified conditions are met. *Id.* § 1068. For example, the DOI must issue a patent when a claimant demonstrates that a tract of "public land" has been held by the claimant, his ancestors, or grantors "in good faith and in peaceful, adverse, possession . . . under claim or color of title for more than twenty years, and that valuable improvements have been placed on such land or some part thereof has been reduced to cultivation . . . ." *Id.* The DOI has the discretion to issue a patent when a claimant demonstrates that the claimant, his ancestors, or grantors have held "public land" under claim or color of title since at least January 1, 1901, and that they have paid taxes on the land.

-11-

*Id.* The CTA provides, however, "[t]hat no patent shall issue . . . for any tract to which there is a conflicting claim adverse to that of the applicant, unless and until such claim shall have been finally adjudicated in favor of such applicant." *Id.*

In denying the Jacobsen defendants' motion, the district court explained:

> The Government opposes Defendants' Motion and argues that it is untimely, amounts to a collateral attack [on] this Court's January [5], 2006 ruling that the United States is the fee simple owner of the disputed property in this action, would result in a waste of judicial resources, would invite judicial conflict, and is otherwise not in the interests of justice. The Government also argues that the Defendants' Color of Title claims should have been brought as compulsory counterclaims in this action pursuant to Fed. R. Civ. P. 13(a) and, at any rate, will be barred by claim preclusion.
>
> This Court finds that the Government's arguments are very persuasive. The Court, therefore, agrees with the Government. Moreover, to repeat the docket entry entered on November 13, the date on which the Court set the current trial date, "[t]he Court makes it clear that it will not continue this trial again." It appears that, beyond ignoring this admonition of the Court, Defendants neglect the plain fact that this matter must be decided.

The district court did not abuse its discretion in refusing to stay the proceedings or reschedule the trial for a third time. We disagree with the Jacobsen defendants' contention that the interests of justice, economy and time warranted a stay of the proceedings. Those interests would not be served by staying one proceeding to allow for administrative proceedings that almost certainly would be fruitless for the applicants. Simply put, the Jacobsen defendants' CTA applications are unlikely to succeed or to otherwise affect the quiet title action. As the DOI explained in an August 2006 letter to counsel for

-12-

the Jacobsen defendants, the disputed property is not "public land" for which the

DOI may issue a patent:

> BLM has only been delegated authority over specific classes of land pursuant to the Federal Land Policy Management Act (FLPMA), 43 U.S.C. § 1702(e), and other specific statutes.

> One of the classes of land over which the BLM does have delegated authority are the "public lands" as that term is defined in the delegation of authority from Congress to BLM in FLPMA. However, "public land" as defined in FLPMA, consists only of those unpatented lands that are not under the jurisdiction of another federal agency. FLPMA does not give the BLM jurisdiction over lands that have previously been patented and then re-acquired by other federal agencies. . . . [T]he subject matter of your client's application, and your suit with the Bureau of Reclamation (Reclamation) is not unpatented "public land" over which BLM has authority but, rather, is land which was previously patented out of the ownership of the federal government and then re-acquired by Reclamation. . . .

> Your letter asserts that, "under the Color of title Act, a property owner who is in possession of land owned by the U.S. government . . . can petition the Secretary of the Interior for *clear title* to that property." (Emphasis added.) That is not what the statute allows. The Color of Title Act allows the Secretary to "*issue a patent*" when certain conditions are met; it does not allow the Secretary to "clear title." Consequently, in the case of true "public lands" for which no patent has ever issued, the Secretary has the ability to issue a patent as may be allowed by Congress. However, a patent is not the same as a quit claim deed or a warranty deed. A patent is a sovereign grant of land that only a sovereign can award. Rather than merely conveying title, a patent actually initiates a chain of title and, indeed, originates title. . . . Thus, a patent can only be granted once because there is no statutory delegation from the Congress to any agency to, in effect, generate a completely new title to lands that have already been granted out by the government. Again, BLM simply has no authority delegated from Congress to issue patents where lands have already been patented and then re-acquired by another federal agency and, consequently, cannot make a determination of your client's claim.

In addition to the likely failure of the CTA application, the district court's denial of the motion to stay is supported by the fact that this action had been ongoing for more than eight years at the time the motion was filed. The Jacobsen defendants did not file their CTA applications until more than six years into the litigation, after the district court had quieted title in the disputed property to the United States. The district court had twice stayed the proceedings or rescheduled the trial to accommodate the defendants. As the district court stated, the matter needed to be decided. For these reasons, the district court acted within its discretion in denying the Jacobsen defendants' motion to stay the proceedings.

B.      Interpretation of the Deeds

In Utah,[5] "[d]eeds are construed according to ordinary rules of contract construction." *Homer v. Smith*, 866 P.2d 622, 629 (Utah Ct. App. 1993). Contract construction "begins and ends with the language of the contract." *Daines v. Vincent*, 190 P.3d 1269, 1277 (Utah 2008). Thus, as the Utah Supreme Court recently explained, the interpreting court must first determine whether the contract's language is ambiguous. *See id.* at 1275–76. A contract term is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.* at 1275 (quotations omitted). This is a question of law for the court to decide

_____

[5]Deeds are a type of contract, and this court presumptively applies state law when interpreting contracts. *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 635 F.2d 797, 802–03 (10th Cir. 1980).

without reference to parol evidence. *Id.* at 1276. When the parties offer opposing interpretations that are reasonably supported by the contract's language, the court should consider extrinsic evidence that supports the parties' interpretations of the contract. *See id.* at 1276–77. In contrast, when the contract language is not susceptible to contrary interpretations, the contract is not ambiguous, and its plain meaning should be enforced. *See id.* at 1277. Thus, evidence beyond the four corners of the contract cannot create an ambiguity when the language of the contract does not support one. *See id.*; *see also Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, – P.3d –, 2009 WL 171701, at *4 (Utah 2009) ("Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law. Only if the language of the contract is ambiguous will we consider extrinsic evidence of the parties' intent.") (quotations omitted).

The Utah Supreme Court provided the following illustration of the rule, which is founded in *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264 (Utah 1995):

> While the *Ward* rule allows for the admission of extrinsic evidence to uncover ambiguity, a finding of ambiguity will prove to be the exception and not the rule. Our holding in *Ward* provides for instances, though rare, where contractual terms are subject to alternative interpretations based on usage. For instance, to an American, the term "boot" refers to something you wear on your foot, but a person from Britain or New Zealand might refer to a "boot" as the storage area in

the back of a car—what Americans would refer to as a "trunk." Likewise, in America, we get "braces" to straighten our teeth, whereas the British use them to hold up their pants. When contracting parties have a contrasting understanding of express terms due to usage, the *Ward* rule provides the court with the ability to place itself in the same situation in which the parties found themselves at the time of contracting. However, as stated above, any contended for interpretation must be reasonably supported by the language of the contract. More simply put, a party cannot make a successful claim of ambiguity based on usage of a term that is not reasonable or is the product of forced or strained construction.

*Daines*, 190 P.3d at 1277 n.5 (quotations and citations omitted).

Thus, we begin with the language of the Madsen and PRWCD deeds, and then we consider whether the parties' contrary interpretations are reasonably founded in that language. The Madsen deed reads:

E.B. Jorgensen and Gertrude S. Jorgensen, his wife, of Salt Lake City, County of Salt Lake, State of Utah, grantors, hereby quit claim to Neil M. Madsen, of Price, Carbon County, Utah, and Andrew C. Madsen, of Mt. Pleasant, Sanpete County, Utah, grantees, for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the following tracts of land in Carbon County, State of Utah, to-wit:

All that portion of the Southeast quarter of the Southeast quarter of Section 10, and the South half of the Southwest quarter of Section 11, Township 12 South, Range 7 East, Salt Lake Meridian, exclusive of right-of-way for Denver & Rio Grande Western Railroad Company heretofore conveyed to said Company by these grantors and exclusive of necessary rights-of-way for outlet tunnel and race for Price River Water Conservation District's Reservoir; also all that portion of the Southwest quarter of the Southeast quarter and the South half of the Southwest quarter of said Section 10, the East half of the Southeast quarter of Section 16, and the West half of the Northwest quarter of Section 28 lying South and/or East or above the Denver & Rio Grande Western Railroad Company's right-of-way as presently located, deed to which right-of-way, grantors have executed and delivered and reference to which right-of-way deed is hereby made.

Also all that portion of the following described lands lying above the 7630 contour line of the Price River Water Conservation District Reservoir in Pleasant Valley, as the said line is surveyed and platted by McGonagle & Ulrich, engineers for said District, to-wit: the South half of the Northwest quarter of the Southwest quarter and the Northwest quarter of Section 17; the East half of the Southwest quarter and the East half of the Northwest quarter of Section 20; the East half of the Northwest quarter and the East half of the Southwest quarter of Section 29. All of said lands being situate in township 12 South of Range 7 East, Salt Lake Meridian, together with the right on the part of the grantees, their heirs, administrators and assigns to use any part or portion of said subdivisions of land below and between the said 7630 contour line and the water line of said reservoir, when the same are not actually covered by the water therein, for any and all purposes not inconsistent with the flowage and storage of water thereon; and together with the right to use any part or portion of the following described lands, to wit; The Southwest quarter of the Southwest quarter of Section 21, the South half of the Southeast quarter, the Northwest quarter of the Southeast quarter and the West half of the Northeast quarter of Section 20, the part of portion of the West half of the Northwest quarter of Section 28, lying below the Denver & Rio Grande Railroad Company right of way, and the Northeast quarter of Section 29, all in Township 12 South, Range 7 East, Salt Lake Meridian, when the same is not covered by water, for any and all purposes not inconsistent with the flowage and storage of water thereon.

Also the right and title of the grantors, now owned or hereafter acquired, in and to all that part or portion of the West half of the Northwest quarter, and the Northhalf of the Southwest quarter of Section 10; Township 12 South, Range 7 east, Salt Lake Meridian, lying above the 7630 contour line of the District's Pleasant Valley Reservoir as the same is surveyed and platted by McGonagle & Ulrich, District Engineers, together with the right on the part of the grantees, their heirs, administrators and assigns to use any part or portion of said subdivisions of land below and between the said 7630 contour line and the water line of said reservoir when the same is not actually covered by the water thereon for any and all purposes not inconsistent with the flowage and storage of water thereon.

And especially granting and conveying unto said grantees, all

coal and other minerals under the surface of said lands with full power to the grantees, their heirs, administrators and assigns, to take all usual, necessary, proper or convenient means to explore for, mine and remove the same.

Breaking the deed into its component parts, the deed clearly conveys the following interests. Under the first clause of the first substantive paragraph, the Jorgensens convey full title (except as to the railroad right-of-way) to "[a]ll that portion" of the southeast quarter of the southeast quarter of section 10, and the south half of the southwest quarter of section 11. The second clause of that paragraph conveys full title (except as to the railroad right-of-way) to "all that portion" of designated subdivisions of sections 10, 16, and 28, but it limits the conveyance to parcels "lying South and/or East or above" the railroad right-of-way. The clause does describe the particular subdivisions of section 10 in which the disputed property is located: the southwest quarter of the southeast quarter, and the south half of the southwest quarter. But because of the qualifying phrase "all that portion . . . lying South and/or East or above" the railroad right-of-way, the clause conveys only the land in section 10 that lies south or east of the right-of-way, or that is higher in elevation than the right-of-way. The conveyance thus excludes the disputed property, which lies north and west of the right-of-way and is generally lower in elevation than the land on the other side of the right-of-way. The district court reached the same conclusion, and the parties do not contest this interpretation.

-18-

The first sentence of the second substantive paragraph conveys full title to designated subdivisions of sections 17, 20, and 29 "lying above the 7630 contour line." For the "portion of said subdivisions of land below and between the said 7630 contour line and the water line of" the PRWCD Reservoir, the deed conveys the use right at issue in this appeal—the right to use that land, when it is not covered by water, "for any and all purposes not inconsistent with the flowage and storage of water thereon . . . ." The second substantive paragraph later grants the same use right for other designated subdivisions in sections 20, 21, 28, and 29, without reference to the 7630 contour line. This paragraph never refers to section 10, the section in which the disputed property is located.

The third substantive paragraph conveys full title to designated land in section 10 that is north of the disputed property and lies "above the 7630 contour line." For the "portion of said subdivisions of land below and between the said 7630 contour line and the water line of" the reservoir, the deed grants the same use right delineated in the previous paragraph: the right to use that land, when it is not covered by water, "for any and all purposes not inconsistent with the flowage and storage of water thereon."

The last paragraph deals with mineral rights and is not at issue in this appeal.

In summary, the Madsen deed conveys: (1) full title to all of the southeast quarter of the southeast quarter of section 10, and the south half of the southwest

quarter of section 11, except for the railroad right-of-way; (2) full title to designated land in sections 10, 16, and 28 that lies to the south or east of, or above, the right-of-way; (3) full title to designated land in sections 17, 20, and 29 that lies above the 7630 contour line; (4) use rights for designated land in sections 17, 20, and 29 that lies below the 7630 contour line; (5) use rights for designated land in sections 20, 21, 28, and 29; (6) full title to designated land in section 10 that is north of the disputed property and lies above the 7630 contour line; and (7) use rights for designated land in section 10 that is north of the disputed property and lies below the 7630 contour line. Significantly, the deed does not describe the disputed property, which lies north and west of, and below, the right-of-way—and is in the south half of the southwest quarter, and in the southwest quarter of the southeast quarter, of section 10. Indeed, by granting only land that is south and east of, and above, the right of way, the first substantive paragraph specifically excludes the disputed property from the description of lands in section 10.

The PRWCD deed, however, does explicitly describe the disputed property. The deed reads in full:

> E.B. Jorgensen and Gertrude S. Jorgensen, his wife, grantors, of Salt Lake City, County of Salt Lake, State of Utah, hereby convey and warrant to Price River Water Conservation District, a public corporation, grantee, of the State of Utah, for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the following described tracts of land in Carbon County, State of Utah, to-wit:

All that portion of the South Half of the Southwest quarter and the Southwest quarter of the Southeast quarter of Section 10; the East half of the Southeast quarter of Section 16, and the West half of the northwest quarter of Section 28 LYING BELOW or North and West of the Denver & Rio Grande Western Railroad Company's right of way as presently located, deed to which right of way grantors have executed and delivered, reference to which right of way deed is hereby made.

Also all that portion of the Southeast quarter of the southeast quarter of Section 10, township 12 South, Range 7 East, Salt Lake Meridian, occupied by the outlet tunnel, race, and other structures of the grantee's Pleasant Valley Reservoir as presently located and used.

Also all that portion of the following described lands lying below the 7630 contour line of the Price River Water Conservation District, reservoir in Pleasant Valley, as the said line is surveyed and platted by McGonable & Ullrich, engineers for said District, To-wit:

Northwest quarter and South half of the Northwest quarter of the Southwest quarter of Section 17; East half of the Southwest quarter, West half of the Southeast quarter, and Southeast quarter of the Southeast quarter, and the West half of the Northeast quarter, and the East half of the Northwest quarter of Section 20; Southwest quarter of the Southwest quarter of Section 21; North east quarter, East half of the Northwest quarter and East half of the Southwest quarter of Section 29, all of said lands being situate in Township 12 South, Range 7 east, Salt Lake Base and Meridian.

Together with all water rights and water appurtenant thereto or used on or in connection therewith, excepting, however, all coal and other minerals under the surface of said lands, and subject to right to graze or otherwise use any portion of said lands where not actually covered by water of grantee's reservoir, heretofore granted to Neil M. Madsen and Andrew C. Madsen.

The first substantive paragraph conveys full title to "[a]ll that portion of" designated subdivisions of sections 10, 16, and 28—including the subdivisions of section 10 where the disputed property is located—and limits the conveyance to

land "LYING BELOW or North and West of" the railroad right-of-way. Thus, the PRWCD deed explicitly conveys full title to the disputed property to PRWCD.

The second substantive paragraph conveys full title to a subdivision of land in section 10 that is located east of the disputed property.

The third and fourth substantive paragraphs convey full title to designated subdivisions of sections 17, 20, 21, and 29 "lying below the 7630 contour line." The fifth substantive paragraph reserves in the Madsens the use right granted to them by the Madsen deed. Thus, all of the land conveyed to PRWCD by the PRWCD deed is subject to the Madsens' use right, to the extent that that right is outlined by the Madsen deed.

Even though the Madsen deed does not describe the disputed property, the defendants interpret that deed as granting them use rights in that property. The Jacobsen defendants argue that the use-right language in the Madsen deed applies "to all described property contained in the deed that borders on the shores of the contemplated reservoir," not simply the subdivisions described by the second and third substantive paragraphs—the paragraphs that contain the use-right language. They contend that the copy of the Madsen deed provided to the district court arguably contains a different paragraph structure than the original deed,[6] which

---

[6]The Madsen deed was recorded in 1927, well before the advent of photocopiers. Thus, the county recorder copied the original deed manually and filed that "abstract" copy in the county records. The original deed is apparently lost, so the district court relied on the abstract copy.

they say would support their interpretation. The Jacobsen defendants further contend that their interpretation "makes the most intuitive sense," because PRWCD only needed land to store water and could allow others to use it when that use did not interfere with the storage and flowage of water.

This interpretation of the Madsen deed, however, is directly contradicted by the language of the deed. The deed does not describe the disputed property, and thus it does not convey any rights to that property. Even if we accept the argument that the use-right provision applies to all property described by the Madsen deed, the fact remains that the deed does <u>not</u> describe the disputed property.

The Dunn and Pannier defendants make a similar argument, although they expressly recognize that "the disputed property was not deeded to the Madsens in the Madsen deed. Rather, it was deeded to Price River Water Conservation District in the Price River deed." Nonetheless, they contend that the use-right provision applies to the "said lands" and "said subdivisions of land" in the second substantive paragraph, which, in turn, refers to parcels previously mentioned in the deed. Those parcels include "the Southwest quarter of the Southeast quarter and the South half of the Southwest quarter of said Section 10"—the subdivisions of section 10 where the disputed property is located. This interpretation, however, ignores the qualifying phrase "*all that portion of* the Southwest quarter of the Southeast quarter and the South half of the Southwest quarter of said

Section 10 . . . *lying South and/or East or above*" the railroad right-of-way, which specifically excludes the disputed property.  (Emphasis added).

The Jacobsen defendants also argue that the language of the Madsen deed is unclear and confusing as to the meaning and scope of the use right.  They further maintain (as did the district court) that the historical use of the disputed property—grazing and other uses by the Madsen successors—suggests that the deed is unclear and ambiguous.  The deed's language, however, is clear: the deed does not mention, explicitly or by reference, the disputed property; thus, it does not convey any rights to the property.  The defendants' reliance on the historical use of the property is misplaced.  It is impermissible to "allow surrounding circumstances to create ambiguity where the language of a contract would not otherwise permit [ambiguity]," *Daines*, 190 P.3d at 1276.  In addition, "there can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms." *Id.* at 1277.

In sum, the exclusion of the disputed property from the Madsen deed is fatal to the defendants' position that the deed conveys them use rights to it.  That interpretation is not reasonably supported by the language of the deed, which cannot be read as conveying rights to property it does not describe.  Thus, the Madsen deed is unambiguous as a matter of law.  It did not convey to the Madsen brothers any rights to the disputed property.  As a result, their successors in interest, including the defendants, also have no rights in the disputed property.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the Jacobsen defendants' motion to stay, and we REVERSE the district court's conclusion that the use-right provisions in the Madsen deed apply to the disputed property.

Appendix

Excerpt of Exhibit 7a:  Section 10, township 12 south,
                        range 7 east, Salt Lake Meridian

