2011 UT App 164

**MERRICK YOUNG INCORPORATED, a Utah Corporation; and Clyde G. Seely, an individual, Plaintiff, Appellant, and Cross-appellee,**

v.

**WAL–MART REAL ESTATE BUSINESS TRUST, a Delaware Business Trust; The American Insurance Company, a Nebraska corporation; et al., Defendants and Appellees,**

and

**Engineered Structures, Inc., an Idaho corporation, Defendant, Appellee, and Cross-appellant.**

No. 20090227–CA.

Court of Appeals of Utah.

May 19, 2011.

E. Scott Savage, Stephen R. Waldron, and Kyle C. Thompson, Salt Lake City, for Appellant and Cross-appellee.

Clark B. Fetzer, Salt Lake City, and Kim Trout and Vicky J. Elkin, Boise, Idaho, for Appellees and Cross-appellant.

Before Judges THORNE, VOROS, and ROTH.

## OPINION

ROTH, Judge:

¶ 1 Plaintiff Merrick Young Incorporated (Merrick Young) challenges the trial court's dismissal with prejudice of its claims (the Wal–Mart project claims) against Defendants Engineered Structures, Inc. (ESI), Wal–Mart Real Estate Business Trust, and the American Insurance Company. The trial court entered the order of dismissal based on the stipulation of Defendants and involuntary Plaintiff Clyde G. Seely, who the trial court determined was the real owner of the Wal–Mart project claims.

¶ 2 ESI cross-appeals the trial court's denial of its motion for sanctions against Merrick Young under rule 11 of the Utah Rules of Civil Procedure. The rule 11 motion alleged that Merrick Young wrongfully continued to prosecute the Wal–Mart project claims after they had been conveyed to Seely. ESI contends that the denial was erroneous because the trial court failed to make findings to support its ruling or, in the alternative, because the court's conclusion that rule 11 had not been violated lacked evidentiary support.

¶ 3 We affirm the dismissal of the Wal–Mart project claims on the basis that a 2004 settlement agreement unambiguously transferred ownership of the Wal–Mart project claims to Seely. With respect to the cross-appeal, we affirm the denial of the rule 11 motion for sanctions on the basis that the issue has not been preserved for appeal.

## BACKGROUND

¶ 4 Merrick Young is a construction company that does business primarily in southern Utah. In the early 2000s, Merrick Young became involved in a number of road projects unrelated to this suit (the other projects), which were bonded by Developers Surety and Indemnity Company (Developers). Developers ultimately paid a number of claims on the other projects and sued Merrick Young and its principals for indemnity under the bonds. That case was resolved by a 2004 Settlement Agreement, Mutual Release, and Assignment (the Settlement Agreement) among Developers, Merrick Young and its principals, and Seely. The question of whether Merrick Young or Seely owns the claims in this case, that is, which of them is the real party in interest and the proper plaintiff, has become the case's central issue and its resolution turns on interpretation of

asset-transfer provisions in the Settlement Agreement.

¶ 5 The Settlement Agreement was entered into in spring 2004, among Merrick Young and its principals, Merrick and Stephanie Young (collectively, the Indemnitors); Stephanie Young's father, Seely; and Developers. Pursuant to the Settlement Agreement, assets belonging to the Indemnitors were transferred to Developers and then to Seely, who in turn paid $150,000 to Developers to resolve Developers' claims against the Indemnitors. According to Merrick Young, the Settlement Agreement unambiguously provides that only certain assets, excluding the Wal–Mart project claims, were subject to the Settlement Agreement and thus transferred to Seely. Alternatively, Merrick Young asserts that the Settlement Agreement is ambiguous regarding its intention to transfer ownership of the Wal–Mart project claims and the trial court should have received parol evidence to ascertain its meaning, rather than granting Defendants' motion for dismissal with prejudice. *See generally Wade v. Stangl*, 869 P.2d 9, 12 (Utah Ct.App. 1994) ("Contract language may be ambiguous if it is unclear, omits terms, or if the terms used to express the intention of the parties may be understood to have two or more plausible meanings." (internal quotation marks omitted)). Defendants argue that the trial court correctly interpreted the Settlement Agreement to unambiguously transfer to Seely all of Merrick Young's assets, other than those specifically reserved to Developers. According to Defendants' interpretation, Seely is the real party in interest with regard to the Wal–Mart project claims by virtue of the Settlement Agreement transfer. With Seely's permission, Defendants therefore moved for—and received—dismissal with prejudice of the Wal–Mart project

claims. The question for our review is whether the Settlement Agreement does in fact transfer the Wal–Mart project claims to Seely.

¶ 6 Merrick Young filed this case in 2001 in an effort to collect from Defendants amounts it claimed were due and owing on a retaining wall subcontract associated with the construction of a Wal–Mart superstore in Washington County, Utah. Named as defendants were ESI, the general contractor on the Wal–Mart project; Wal–Mart Real Estate Business Trust, the owner of the land on which the project was being developed; and American Insurance Company, the company that issued the construction surety bond. ESI counterclaimed, asserting that Merrick Young had breached the retaining wall subcontract by providing materials below specification and failing to make payment to its material suppliers.[1]

¶ 7 While this case was pending, Developers sued the Indemnitors to recover payments it had made on claims against the construction bonds Developers had issued on the other projects (the Developers suit). In connection with the issuance of the bonds, the Indemnitors and Developers had entered into an Indemnity Agreement under which Merrick Young secured its obligations by assigning all its assets to Developers upon the occurrence of a default. This assignment included not only Merrick Young's rights in the construction contracts on the other projects but also in " 'all sums due or to become due on all other contracts, covenants and agreements whether bonded or unbonded, in which the ... Indemnitor[s] ha[ve] any interest, together with any notes, accounts receivable or *chose in action* related thereto.' " (Emphasis added.)[2]

---

1.  ESI also brought cross-claims and third party claims against the Wal–Mart Real Estate Business Trust and Wal–Mart Stores, Inc. (collectively, Wal–Mart). Eventually, ESI and Wal–Mart resolved their dispute, and Wal–Mart joined with ESI to defend against Merrick Young's claims.

2.  The Settlement Agreement, in its recitals, set out verbatim pertinent portions of the Indemnity Agreement, including its indemnification language and the following portion of the "Assignment" paragraph:

    To secure the obligations of ... [the] Indemnitor[s] hereunder ..., [the Indemnitors] hereby assign, transfer, pledge and convey to [Developers], effective immediately and only in the event that there shall be an event of default hereunder, all rights in and to ...:

    . . . .

    Any and all sums due or which may become due upon partial or full performance of the Obligation and all sums due or to become due on all other contracts, covenants and agreements whether bonded or unbonded, in which

¶ 8 On March 18, 2003, pursuant to the Indemnity Agreement and based on "a substantial likelihood" that it would "prevail on the merits," Developers obtained an order in the Developers suit for a prejudgment writ of attachment and garnishment (the attachment order) that permitted it "to execute, attach, and garnish ... the accounts receivable, assets, interests, money, stocks, memberships, bonds, real property, and personal property in which the Indemnitors have an interest, including but not limited · to," the specific assets and categories of assets described in an eight-paragraph list.[3] About a year later, Developers, the Indemnitors, and Seely entered into the Settlement Agreement to resolve the Developers suit. · In that agreement, the Indemnitors "assigned, transferred, and set over to Developers" all their interests in the "Indemnitors' Assets," and Developers, for its part, "assign[ed], transfer[red], and set[ ] over" all its interests in the "Indemnitors' Assets" (other than the Black Ridge Drive project, which Developers retained), along with its interest in the Developers suit, to Seely in return for his payment of $150,000 to Developers. The scope of the asset transfer to Seely, that is, whether the Settlement Agreement term "Indemnitors' Assets" included the Wal–Mart project claims, is the central issue on which the motion for dismissal in the present case turned.

¶ 9 In the recitals section of the Settlement Agreement, Merrick Young and Developers describe the circumstances that led to their agreement, including, in paragraph F, a reference to the Developers suit that quotes at length from the attachment order. The term "Indemnitors' Assets," which is used throughout the balance of the Settlement Agreement to refer to the core property interests being "assigned, transferred, and set over" by the Indemnitors, first to Developers, and then to Seely, is introduced in brackets in the midst of that quote. Because

of its importance to our resolution of the issue, we reproduce the following portion of that language from the attachment order, with emphasis on the words that we see as particularly pertinent:

> "IT IS FURTHER HEREBY ORDERED, ADJUDGED AND DECREED that pursuant to U[tah] R[ules of] C[ivil] P[rocedure] 64C and ... 64D, Developers may execute, attach and garnish, in the amount of $540,668.61, *the accounts receivable, assets, interests, money, stocks, memberships, bonds, real property, and personal property in which the Indemnitors have an interest, including but not limited to, the following:*
>
> 1. [The Youngs' Washington County Residence]
>
>    . . . .
>
>    The above real property ... and any funds obtained from its sale, *including all other assets of the Indemnitors.*
>
> 2. Funds due and owing to [the] Indemnitors ... for the project known as Black Ridge Drive....
>
> 3. Funds due and owing to [the] Indemnitors ... for the project known as River Road....
>
> 4. Funds due and owing to [the] Indemnitors ... for the project known as I–15 Sevier River Northward Project....
>
> 5. Funds due and owing to [the] Indemnitors ... for the project known as UDOT I–15 North Interchange....
>
> 6. *Any equity in any other real property, business or asset in which any Indemnitor has an interest.*
>
> 7. *Any money, stocks, bonds, or other assets of any Indemnitor.*
>
> 8. Any interest in Black Ridge Commercial Center, LLC; Black Ridge, LLC, or any other partnership, limited partnership, limited liability company, sole proprietorship, corporation, or other

---

the ... Indemnitor[s] ha[ve] any interest, together with any notes, accounts receivable or chose in action related thereto.
. . . .
Any an[d] all undisbursed loan funds, deposits or interest reserve accounts to which the ... Indemnitor[s] may be entitled, and any and all collateral for any undertakings given by ...

[the] Indemnitor[s] ... in connection with any Obligation.
(Third and fifth omissions in original.)

**3.** Judge G. Rand Beacham, the trial judge in this case, also entered the attachment order in the Developers suit.

business entity in which any Indemnitor has an interest, and any real property in which these entities have an interest. [*All assets referenced in paragraphs 1 through 8 of the Court's Order are referred to in this Agreement as 'Indemnitors' Assets'*].”

(Last alteration in original) (emphases added).

¶ 10 Based on what Defendants read as expansive language used throughout the Settlement Agreement and in the attachment order quoted in its recitals, Defendants interpreted the term “Indemnitors' Assets” to mean *all* of the Indemnitors' assets, including the Wal–Mart project claims, and moved to substitute Seely, to whom those assets had been transferred, as the plaintiff in this case.[4] Merrick Young, on the other hand, claimed that the term excluded any asset, such as the Wal–Mart project claims, not identified either by specific reference or particular category in paragraphs 1 through 8. Merrick Young therefore opposed joinder or substitution. Without determining whether Seely actually owned the Wal–Mart project claims, the trial court joined Seely as a necessary party. ESI then filed counterclaims against Seely, to which Seely responded with a motion to dismiss. The trial court denied the motion, finding that “[t]he claims made in this case by [Merrick Young] constituted a chose in action[,] which was an asset of [Merrick Young] … [t]hat … was attached by Developers in [the Developers suit] …, and it was transferred to Mr. Seely in accordance with the ‘Settlement Agreement.’ ” The court cited the Settlement Agreement's references in paragraph 6 to “ ‘[a]ny equity in any other … asset in which any Indemnitor has an interest’ ” and in paragraph 7 to “ ‘[a]ny … other assets of any Indemnitor’ ” as support for its conclusion that all of the Indemnitors' assets had been transferred to Seely pursuant to the Settlement Agreement. (Alterations in original.)

¶ 11 In October 2008, Seely and Defendants entered into a settlement agreement in which Seely agreed to dismiss the Wal–Mart project claims in exchange for Defendants' dismissal of their counterclaims against Seely. Defendants then filed a motion to dismiss the case against them, together with their counterclaims against Seely, indicating to the trial court that Seely did not oppose the motion. On January 21, 2009, the trial court granted the motion on the basis that it had previously determined that Seely, and not Merrick Young, was the owner of the Wal–Mart project claims. The court also declined Merrick Young's request to reconsider that previous ruling, stating that there was “no ambiguity in the [Settlement] Agreement.” Accordingly, it dismissed with prejudice the claims against Defendants and Defendants' counterclaims against Seely, leaving Defendants' counterclaims against Merrick Young still pending. The court then certified the order as final pursuant to rule 54(b) of the Utah Rules of Civil Procedure, and Merrick Young appealed.

¶ 12 Prior to settling with Seely, ESI delivered to Merrick Young a notice of intent to request sanctions pursuant to rule 11 of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 11(b)-(c) (permitting a party to request sanctions when the other party has made claims for an improper purpose, that are not warranted by law or are frivolous, or that lack evidentiary support). In its notice, ESI demanded that Merrick Young dismiss the Wal–Mart project claims and amend its answer to ESI's counterclaims to state that it did not own the Wal–Mart project claims. When Merrick Young failed to respond to the notice, ESI moved for sanctions. The trial court denied the motion, and ESI appealed once the denial order was certified as final under rule 54(b). This court consolidated Merrick Young's and ESI's appeals into the matter now before us.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Merrick Young appeals the trial court's decision to recognize Seely's agreement with Defendants as a basis for dismissing the Wal–Mart project claims. Specifically, it asserts that the court erred in

---

4.  In the alternative to substitution, Defendants moved to join Seely as a plaintiff. Their apparent ultimate goal, however, was to have Seely declared the owner of the Wal–Mart project claims and the real party in interest in this case.

interpreting the Settlement Agreement to transfer ownership of the Wal–Mart project claims to Seely because the Wal–Mart project claims are unambiguously not among the assets described in paragraphs 1 through 8. Merrick Young alternatively argues that if the Settlement Agreement is not unambiguous in its favor, it is at least ambiguous because it is subject to two plausible interpretations. "Whether an ambiguity exists in a contract is a question of law[, which] we review ... for correctness." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 14, 133 P.3d 428 (citation and internal quotation marks omitted). We likewise review the trial court's interpretation of a contract for correctness. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263.

¶ 14 ESI challenges the denial of its rule 11 motion for sanctions. When considering the trial court's ruling on a motion for rule 11 sanctions, we apply a three-tiered approach in which we review (1) findings of facts for clear error, (2) legal conclusions for correctness, and (3) the type and amount of sanction, if any, for abuse of discretion. *See Morse v. Packer*, 2000 UT 86, ¶ 16, 15 P.3d 1021.

### ANALYSIS

### I. Interpretation of the Settlement Agreement

¶ 15 Merrick Young and Defendants agree that the central question presented in Merrick Young's appeal is the scope of the assets transferred under the Settlement Agreement. To resolve that question, we must consider whether the term "Indemnitors' Assets" unambiguously includes *all* of Merrick Young's assets.

¶ 16 The Settlement Agreement defines the term "Indemnitors' Assets" in the context of a lengthy quote from the attachment order set out in paragraph F of the Settlement Agreement's recitals and reproduced above, *see supra* ¶ 9. Merrick Young contends that the trial court erred in determining that the "Indemnitors' Assets" that were ultimately transferred to Seely unambiguously included the Wal–Mart project claims.

Rather, Merrick Young interprets the Settlement Agreement to unambiguously exclude the Wal–Mart project claims because the Settlement Agreement's language indicates its intent to narrowly define "Indemnitors' Assets" to include only the assets within the referenced eight paragraphs, none of which include the Wal–Mart project claims either specifically or categorically. Alternatively, Merrick Young contends that the Settlement Agreement is ambiguous because its interpretation is as plausible as Defendants'. Defendants counter that the trial court correctly interpreted the Settlement Agreement in accordance with the parties' manifest intentions to transfer all of Merrick Young's assets to Seely. Defendants assert that the Settlement Agreement, taken as a whole and in conjunction with the all-inclusive language of paragraphs 6 and 7, supports this interpretation.

¶ 17 The goal of contract interpretation is to give effect to the contracting parties' intentions at the time the contract was made. *See WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139. Thus,

> [u]nder well-accepted rules of contract interpretation, we [begin our analysis by] look[ing] to the language of the contract to determine its meaning and the intent of the contracting parties. We also "consider each contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none."

*Café Rio, Inc. v. Larkin–Gifford–Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (omission in original) (footnote omitted) (quoting *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Larry J. Coet Chevrolet, Pontiac Buick, Inc. v. Labrum*, 2008 UT App 69, ¶ 18, 180 P.3d 765 (internal quotation marks omitted). If, however, the court determines that the language is ambiguous, the parties' intent is a question of fact and extrinsic evidence regarding their intentions may be considered. *See City of*

*Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 31, 233 P.3d 461.

■ ¶ 18 The Utah Supreme Court has explained that a contract is ambiguous if "it is unclear, it omits terms, or the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428 (internal quotation marks omitted). In this case, neither party asserts that the contractual language is unclear because the term "Indemnitors' Assets" is commonly associated with more than one meaning or that the purpose of the contract cannot be ascertained from its language. Nor do they contend that the contract is missing terms. Instead, the parties argue that the contract is subject to two different interpretations. "[T]he fact that the parties differ as to the interpretation of an agreement[, however,] does not alone establish that ambiguity exists." *Winegar v. Froerer Corp.*, 813 P.2d 104, 109 (Utah 1991); *see also Saleh*, 2006 UT 20, ¶ 17, 133 P.3d 428 ("[W]ords and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests."). To be ambiguous, both interpretations must be plausible in the context of the contract as a whole. *See WebBank*, 2002 UT 88, ¶ 27, 54 P.3d 1139. Consequently, our review requires us to determine whether Merrick Young's and Defendants' differing interpretations of the term "Indemnitors' Assets" are both plausible when considered in relation to the Settlement Agreement's other provisions.

■ ¶ 19 Turning now to the Settlement Agreement, we begin our analysis by considering the term "Indemnitors' Assets" in relation to the other contract provisions. In paragraph D of the recitals, the Settlement Agreement quotes verbatim key terms of the pre-existing Indemnity Agreement. In particular, it quotes the provision by which the Indemnitors, " 'effective immediately upon . . . default,' " " 'assign[ed], transfer[red], pledge[d,] and convey[ed]' " to Developers all assets belonging to Indemnitors or to which Indemnitors were entitled, including any " 'chose in action related [to other contracts].' " Developers filed the Developers suit because Merrick Young had defaulted on the Indemnity Agreement. Thus, by the terms of the Indemnity Agreement, Developers had a colorable claim to ownership and control of all Merrick Young's assets, including the Wal–Mart project claims, at the time it sought the attachment order.

¶ 20 Paragraph F of the recitals states that, pursuant to the attachment order, Developers "obtained judgment [5] against the Indemnitors," and goes on to quote at length provisions of the attachment order that empower Developers to seize and liquidate all of Merrick Young's assets (as well as some of the Youngs' personal assets) to collect its $540,668.61 claim. According to the attachment order, Developers could " 'execute, attach and garnish . . . the accounts receivable, assets, interests, money, stocks, memberships, bonds, real property, and personal property in which the Indemnitors have an interest, *including but not limited to,* the following . . . .' " (Emphasis added.) The order then enumerated eight paragraphs of assets. There is no dispute that this broadly-worded provision of the attachment order was intended to—and did—include every asset in which Merrick Young had an interest.

¶ 21 Merrick Young contends, however, that for purposes of the Settlement Agreement, Developers and Merrick Young intended to limit the term "Indemnitors' Assets" to just those assets specifically delineated in the eight paragraphs and did so explicitly by defining "Indemnitors' Assets" to include only paragraphs 1 through 8, thereby implicitly eliminating from the definition of "Indemnitors' Assets" the all-inclusive "including but not limited to" language from the attachment order. Merrick Young contends that this broad prefatory language indicates Developers' understanding in crafting the attachment order that Merrick Young had as-

---

5. While this language states that Developers obtained a judgment, the attachment order itself does not specifically grant judgment; rather, it permits prejudgment levy on Merrick Young's assets to collect the amount of Developers' claims. Merrick Young does not appear to have contested either the order or the amount sought by Developers. Whether judgment or prejudgment, the effect on Merrick Young's property appears to be the same.

sets that fell outside the eight paragraphs, of which the Wal–Mart project claims were an example. Merrick Young reasons that this drafting choice should be seen as deliberate and evidences an intent to limit the transfer in the Settlement Agreement to only certain assets, in contrast to the broader purpose of the attachment order itself. Had there been a contrary intent, it argues, "Indemnitors' Assets" would have been defined by including all the asset-defining language of the attachment order or simply as "all assets." Although this interpretation has some initial appeal, we conclude that it is not plausible in the context of the Settlement Agreement as a whole.

¶ 22 First, in choosing to quote selected portions of both the attachment order and the Indemnity Agreement, the parties drafted a Settlement Agreement that affirms that the attachment order itself had as broad a reach as the Indemnity Agreement—that is, it encompassed *all* assets of Merrick Young: "Developers may execute, attach and garnish . . . the accounts receivable, assets, interests, money, stocks, memberships, bonds, real property, and personal property in which the Indemnitors have an interest. . . ." The "including but not limited to" language that immediately follows only highlights the comprehensive nature of the attachment order. Indeed, the phrase can be read to indicate that the contracting parties intended to include all of the Indemnitors' assets within the eight paragraphs but that they included the common catch-all phrase in case any asset was inadvertently missed. The general, expansive language used in several of the paragraphs reinforces this interpretation. For example, Developers were empowered to "execute, attach and garnish" upon

1. [The Youngs' Washington County Residence] . . . .

   The above real property . . . and any funds obtained from its sale, *including all other assets of the Indemnitors.*

   . . . .

6. *Any equity in any other* real property, business or *asset* in which any Indemnitor has an interest.

7. *Any* money, stocks, bonds, or *other assets of any Indemnitor.*

(Emphases added.)

¶ 23 Merrick Young nevertheless contends that despite the use of the word "any," paragraphs 6 and 7 are limited by the rule of construction *ejusdem generis. See generally Café Rio, Inc. v. Larkin–Gifford–Overton, LLC,* 2009 UT 27, ¶ 25, 207 P.3d 1235 ("[U]nder the well-established rule of construction *ejusdem generis,* we determine the meaning of a general contractual term based on the specific enumerations that surround that term." (internal quotation marks omitted)). Therefore, it argues, paragraph 6 relates only to assets in which the Indemnitors have built equity, while paragraph 7 is limited to liquid assets similar to those listed: money, stocks, and bonds. Because a choses in action merely represents a right to sue upon a debt, rather than an established, certain sum of money or equity interest, Merrick Young argues that the Wal–Mart project claims do not fall within paragraphs 6 or 7.

¶ 24 Even if the listing of assets of similar type in paragraphs 6 and 7 can be read in isolation to imply that the seemingly all-inclusive language of each paragraph was intended to be more limited in scope, the circumstances in which the Settlement Agreement was created, apparent from the agreement's own recitals, diminish the value of *ejusdem generis* as an indicator of the parties' intent to restrict these paragraphs to only assets of a similar kind. When Developers first drafted the language in question as part of the attachment order, its overall purpose was clearly to ensure that the description of assets subject to attachment did not leave out anything that might contribute to the recovery of its half-million-dollar claim. To that end, the language that preceded the eight numbered paragraphs was all-encompassing, describing in general terms all potential classes of assets and then introducing the numbered paragraphs with the common catch-all phrase "including but not limited to." In that context, there is no apparent reason for Developers to have intended the eight paragraphs to exclude assets. Rather, the intent was to set out, in more specific language, the assets and categories of assets

that it knew of or that were likely within the scope of all Merrick Young's holdings, in order to ensure that the attachment order unequivocally wrapped up all of Merrick Young's property of any substance. References in paragraphs 6 and 7, respectively, to "[a]ny equity in any other . . . asset in which any Indemnitor has an interest" and "[a]ny . . . other assets of any Indemnitor" therefore appear intended to emphasize the all-inclusive nature of Developers' legal hold on all of Merrick Young's assets as a means to liquidate its claims, rather than to be an exercise in precision drafting calculated to exclude any assets that do not fit a particular category.

¶ 25 This conclusion is reinforced by the language of paragraph 1, which describes specific real property of the Youngs "and any funds obtained from its sale" but adds the clause "*including all other assets of the Indemnitors.*" (Emphasis added.) Paragraph 1's description of a single, specific parcel of real property does not readily permit the inference of an asset category subject to *ejusdem generis* interpretation, and Merrick Young has provided no alternative explanation for the expansive language that follows the identification of the Youngs' personal residence. Given the Settlement Agreement's description of the events surrounding its drafting, we believe paragraph 1 can be read as a further example of Developers' all-inclusive approach to the description of Merrick Young's assets in the attachment order, which began with the "including but not limited to" language of the preface and appears to carry over into the wording of the eight paragraphs themselves. In other words, the paragraphs were meant to more specifically enumerate Merrick Young's assets in order to emphasize the broad scope of the attachment, rather than to establish any limitation on the fundamental premise that all Merrick Young's assets were included. Such a reading strengthens our conclusion that paragraphs 1 through 8 are intended to include all of the assets of Merrick Young.[6]

¶ 26 More significantly, however, the language and structure of the Settlement Agreement's sequential transfers of the "Indemnitors' Assets" confirms that the parties intended that all of Merrick Young's assets end up in Seely's control. Paragraph D of the Settlement Agreement's recitals expressly acknowledges that the Indemnity Agreement was intended "to assign to Developers accounts receivable and contracts" belonging to the Indemnitors upon default and went on to quote that agreement's language describing all of the Indemnitors' assets subject to that assignment, including choses in action. Paragraph 2(b) of the Settlement Agreement then "confirm[s]" that "*Indemnitors* have assigned, transferred, and set over *to Developers* any and all interests, rights, and title that Indemnitors possess or may possess to Indemnitors' Assets." (Emphases added.) And paragraph 2(d) provides, in turn, that "*Developers* . . . hereby assigns, transfers, and sets over *to Seely* all Indemnitors' Assets," except for interests related to the Black Ridge Drive project, which are not pertinent to this appeal. (Emphases added.) Paragraph 2(g) then summarizes the effects of this three-way transfer:

> As stated in paragraphs 2(b) and 2(d), and as of the date of this [Settlement] Agreement, *all of Indemnitors' assets and all interests therein* (except those reserved to Developers), *which have been or could be attached* by Developers via the [Indemnity Agreement] or otherwise, are hereby conveyed to Developers and then to Seely.

(Emphases added.) Nothing about this arrangement suggests that Merrick Young or Seely wanted Developers to retain an interest in any assets subject to the Indemnity Agreement assignment or the attachment order. To the contrary, it is clear that the Settlement Agreement was intended to en-

---

**6.** Further quoted in the Settlement Agreement is the portion of the attachment order that enjoins the Indemnitors from "selling, transferring, disposing, distributing, pledging, or encumbering any corporate assets, limited liability company assets, partnership assets, real property, personal property or assets of any business entity in which Indemnitors possess an interest until further order of this [c]ourt" except for an allotment to the Youngs of "reasonable funds for reasonable daily living expenses . . . necessary to sustain life and health." This provision is further evidence of the expansive scope of the attachment order in service to Developers' goal of ensuring that no significant Merrick Young asset remained unencumbered.

sure that Developers gave up all its interests in any Merrick Young asset, other than those specifically reserved, interests that under the Indemnity Agreement and the attachment order affected the entirety of Merrick Young's property of any kind. But, there are no terms in the Settlement Agreement that provide for the return or release of any assets covered by the assignment and the attachment order to Merrick Young. In fact, under the Settlement Agreement, Developers does not release its claims against Merrick Young or its property; rather, it "assign[s] the Indemnity Litigation [Developers suit] to Seely." Thus, given the expansive reach of both the Indemnity Agreement and the attachment order, the failure to reassign any assets to Merrick Young necessarily means that every asset in which Merrick Young had an interest had to have been either transferred to Seely or retained by Developers.[7] Merrick Young's contention that the term "Indemnitors' Assets" has a limited scope is therefore untenable because it would not have given effect to the parties' manifest intent to ensure that all Developers' claims to Merrick Young's assets ended up in Seely's hands, lest any such interest remain with Developers by default.

¶ 27 Thus, analysis of the Settlement Agreement as a whole leads us to the conclusion that, in terms of both its pervasive all-encompassing language and the purpose to be accomplished, the defined term "Indemnitors' Assets" is not ambiguous and means all of Merrick Young's assets. As a result, Merrick Young's definition of the term to exclude the Wal–Mart project claims is not a reasonable alternative interpretation. *See generally WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 27, 54 P.3d 1139 (requiring competing interpretations to be "tenable, reasonable, and supportable after a careful review of the document[ ]"). The trial court's conclusion that the Settlement Agreement was unambiguous is therefore correct. And, because the Settlement Agreement unambig-

uously transfers all of Merrick Young's assets, except where specifically reserved, the trial court correctly found Seely to be the owner of the Wal–Mart project claims and properly dismissed them at the request of Defendants and Seely.

¶ 28 As a final matter, we address Merrick Young's contention that the trial court failed to properly analyze its alternative claim that the Settlement Agreement was ambiguous with regard to the term "Indemnitors' Assets." The Utah Supreme Court in *Daines v. Vincent*, 2008 UT 51, 190 P.3d 1269, clarified the two-step analytical process to be followed where there is a claim of facial ambiguity in a contract: "First, . . . '[w]hen determining whether a contract is ambiguous, any relevant evidence must be considered.' . . . Second, after a judge considers relevant and credible evidence of contrary interpretations, the judge must ensure that 'the interpretations contended for are reasonably supported by the language of the contract.' " *Id.* ¶ 26 (alteration in original) (quoting *Ward v. Intermountain Farmers Assoc.*, 907 P.2d 264, 268 (Utah 1995)); *see also Ward*, 907 P.2d at 268 ("Rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties . . . so that the court can place itself in the same situation in which the parties found themselves at the time of contracting." (omission in original) (internal quotation marks omitted)). Merrick Young contends that the trial court, in making its determination regarding ambiguity, failed to consider relevant extrinsic evidence as required by *Daines*. In the trial court, Merrick Young offered declaration testimony from Seely that he did not understand the Settlement Agreement to transfer the Wal–Mart project claims to him and that he had never asserted any interest in those claims. Merrick Young also requested a hearing for the purpose of presenting testimony from its principal that neither Develop-

---

7. In this regard, we do not view the lack of a capital "a" in the phrase "Indemnitors' assets" in paragraph 2(g) to necessarily be the result of typographical error. Rather, in the context of paragraph 2(g)'s summary of the effects of the transaction, it may just as likely have been deliberate and intended to make more plain and un-

equivocal that the term "Indemnitors' Assets," if there was any question left, was meant to include *all* of the "assets" of the Indemnitors. Nevertheless, because the question of whether the lower-case "a" was accidental or intentional cannot be resolved on the face of the document, we do not include it in our analysis.

ers nor the Indemnitors intended to include the Wal–Mart project claims within the definition of "Indemnitors' Assets" as well as evidence that unspecified other assets remained in Indemnitors' control after the execution of the Settlement Agreement. Merrick Young contends that the trial court erred when it declined to hold the requested hearing and consider the proffered evidence. We disagree.

¶ 29 First, although the trial court did not explicitly accept extrinsic evidence, it indicated in its ruling dismissing the Wal–Mart project claims and the counterclaims against Seely that it had "fully reviewed this matter." From this statement, we can presume that the trial court closely examined all of the documents filed in support of the parties' respective interpretations of the Settlement Agreement. Thus, even though the court did not receive evidence from Merrick Young's principal that the company had a contrary intent when it signed the Settlement Agreement, it clearly understood this to be Merrick Young's position.

¶ 30 Moreover, Merrick Young ignores the second step of *Daines*'s two-part approach for determining whether a contract is ambiguous, which requires "a judge [to] ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'" *Daines*, 2008 UT 51, ¶ 26, 190 P.3d 1269 (quoting *Ward*, 907 P.2d at 268). In other words, "a preliminary consideration of all credible evidence does not create a preference for that evidence over the language of the contract" nor can it "create ambiguity where the language of a contract would not otherwise permit." *Id.* ¶ 27 (citation and internal quotation marks omitted). The trial court's ruling indicates that it considered Merrick Young's alternate interpretation but disagreed that there was any ambiguity in the Settlement Agreement that would accommodate it. The court noted that the parties quoted key provisions of the Indemnity Agreement and the attachment order in the Settlement Agreement. The trial court therefore was not only well apprised of the circumstances surrounding the document's drafting but also convinced that "[t]he intent of the parties to the [a]greement [wa]s

clearly expressed in the written terms." Thus, the receipt of extrinsic evidence pursuant to *Daines* would only serve to bolster Merrick Young's already well-stated contention that it had a contrary intent, something the court was well aware of and took into account in its decision.

## II. Sanctions

¶ 31 In its cross-appeal, ESI contends that the trial court erroneously denied its rule 11 motion for sanctions. ESI sought rule 11 sanctions because it claimed that Merrick Young unreasonably continued to prosecute the Wal–Mart project claims even though it was aware that Seely was the real owner of the claims as a consequence of the Settlement Agreement. *See generally* Utah R. Civ. P. 11(b)-(c) (permitting a trial court to enter sanctions where a party brings an action for an improper purpose, without a basis in the law, or without evidentiary support). The Utah Supreme Court has announced a tiered approach for reviewing the grant or denial of such motions. *See Barnard v. Sutliff*, 846 P.2d 1229, 1234 (Utah 1992). Under this approach, we review a trial court's findings of fact for clear error and its conclusions of law about whether rule 11 has been violated for correctness. *See id.*

¶ 32 ESI's contention that the court improperly denied its motion for sanctions is two-fold: it claims that the trial court failed to make the required findings to support the denial of sanctions, and, in the alternative, it asserts that the decision is not supported by the record evidence. In support of its claim that the findings are inadequate, ESI points out that the trial court failed to make any factual findings or conclusions of law that described its rationale for denying the rule 11 motion. Indeed, the trial court stated simply, "Having reviewed the voluminous materials in support, and the considerable materials filed in opposition, the Court finds insufficient evidence of violation of Rule 11(b)." "When denying a rule 11 motion for sanctions, a trial court must ... describe the conduct constituting the basis for the denial" or otherwise give an "appropriate explanation of the trial court's rationale." *Morse v. Packer*, 1999 UT 5, ¶ 13, 973 P.2d 422.

¶ 33 ESI, however, has failed to demonstrate that it raised the absence of required findings to the trial court.

> [I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding.

*438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (alterations in original) (citations and internal quotation marks omitted); *see also In re K.F.*, 2009 UT 4, ¶ 62, 201 P.3d 985 (requiring a party to object to the adequacy of the findings in the trial court to preserve the issue for appeal). Indeed, not only would "[j]udicial economy ... be disserved if we permitted a challenge to the adequacy of the detail in the findings to be heard for the first time on appeal," but also it is the type of error that is "easy for a trial judge to correct" and is "best corrected when the [case] ... is fresh in the judge's mind." *K.F.*, 2009 UT 4, ¶ 63, 201 P.3d 985. "[I]t is [therefore] ... wholly necessary for a party to challenge and thus afford the trial court 'an opportunity to correct the alleged error' of inadequately detailed findings in order to provide for meaningful appellate review of the court's decision." *Id.* ¶ 61 (quoting *438 Main. St.*, 2004 UT 72, ¶ 51, 99 P.3d 801). ESI neglected to make such a challenge here. Certainly, had ESI alerted the trial court to its failure to make appropriate findings supporting its denial of the rule 11 motion, the court would have had the opportunity to do so, perhaps avoiding this aspect of the appeal altogether but, in any event, providing the necessary factual basis for assessing the validity of the court's decision. ESI now asks us to send the case back to the trial court to make findings on a complicated record when the issue is no longer fresh, with the prospect of the matter coming back up to this court on appeal. This problem was readily apparent at the time and should have been brought to the trial court's attention when it could have been most efficiently and effectively corrected.

¶ 34 ESI alternatively contends that the record evidence does not support the trial court's decision to deny sanctions. Without adequate findings, however, this court is unable to conduct the appropriate review. *See Morse*, 1999 UT 5, ¶ 14, 973 P.2d 422 (observing that the court was unable to apply the standard of review where the trial court failed to provide "any meaningful explanation supporting ... [its] order denying sanctions"). In the absence of such findings, ESI's extended argument that the record supports a different conclusion amounts to an invitation to this court to make the requisite findings itself, something an appellate court is ill-equipped to do and ought especially to avoid in cases where the ultimate decision is within the particular realm of trial court discretion. *See Archuleta v. Galetka*, 2008 UT 76, ¶ 7, 197 P.3d 650 ("Decisions regarding rule 11 sanctions are best left in the hands of the trial court. We therefore accord reasonable discretion to the trial court to determine when sanctions are useful and appropriate."); *cf. Rucker v. Dalton*, 598 P.2d 1336, 1338 (Utah 1979) ("[I]t is not the function of an appellate court to make findings of fact because it does not have the advantage of seeing or hearing the witnesses testify."). In this respect, we agree with the statement of the court in *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871 (10th Cir.1984), albeit made in a different context:

> "It may be that adequate evidence as to these matters is in the present record. On that we do not pass, for it is not the function of th[e appellate c]ourt[s] to search the record and analyze the evidence in order to supply findings which the trial court failed to make."

*Id.* at 878 (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 421, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943)). In this case, the trial court failed to make the required findings and ESI failed to preserve the issue. It is not appropriate for this court to remedy the lack of findings or to initiate another round of proceedings that could have been avoided by alerting the trial court to the error at the appropriate time.

¶ 35 Consequently, we affirm the ruling of the trial court.[8]

## CONCLUSION

¶ 36 The trial court correctly concluded that the Settlement Agreement as a whole unambiguously provided for all of Merrick Young's assets, including the Wal–Mart project claims, to be transferred to Seely. We therefore affirm the trial court's dismissal of the Wal–Mart project claims against Defendants. With respect to ESI's contention that the trial court improperly denied its motion for rule 11 sanctions, we affirm because the issue was not preserved for appeal.

¶ 37 WE CONCUR: WILLIAM A. THORNE JR. and J. FREDERIC VOROS JR., Judges.

---

8. The trial court's decision not to award rule 11 sanctions does not appear to be inappropriate here in any case. Although the trial court's ultimate resolution of the contract interpretation dispute, affirmed on appeal—that the Settlement Agreement unambiguously transferred the Wal–Mart project claims to Seely—suggests that the matter was easily resolved in favor of Defendants, the analytical path to that conclusion was neither straight nor easily navigated. Indeed, questions of contract ambiguity can be both difficult and controversial. *See, e.g., Ward v. Intermountain Farmers Assoc.*, 907 P.2d 264 (Utah 1995) (concluding by a 4–1 vote that a contract was ambiguous with respect to whether the term "safflower" referred only to the crop or also to the fields in which it had been planted but splitting into a three-justice majority, with one concurrence and one dissent on how to reach that result). And Merrick Young's position, while ultimately unsuccessful, was far from frivolous, making it highly unlikely that Merrick Young could be found to have acted with any of the requisite motivations required for an award of sanctions under rule 11. *See generally* Utah R. Civ. P. 11(b)-(c) (allowing sanctions to be entered where a party has made claims for an improper purpose, that are not based on existing law, that are frivolous, or that lack evidentiary support).